IN RE T.D.P.

[164 N.C. App. 287 (2004)]

IN RE T.D.P.

No. COA03-222

(Filed 18 May 2004)

**Termination of Parental Rights— willful failure to pay support—ability to pay**

The trial court did not err by terminating respondent incarcerated father's parental rights under N.C.G.S. § 7B-1111(a)(3) based on respondent's willful failure to pay a reasonable portion of the cost of his minor child's foster care for six months prior to the petition, because: (1) contrary to respondent's assertion, a support order is not necessary to require him to pay a portion of the cost of the minor child's foster care; and (2) there was clear and convincing evidence that respondent had an ability to pay an amount greater than zero based on his being paid for work in the prison kitchen even though respondent's wages were meager.

Judge WYNN dissenting.

Appeal by respondent from order entered 1 April 2002 by Judge Edward A. Pone in Cumberland County District Court. Heard in the Court of Appeals 13 January 2004.

*John F. Campbell for petitioner-appellee.*

*Womble Carlyle Sandridge & Rice, by Stuart A. Brock, and Robin Weaver-Hurmence, for Guardian ad Litem-appellee.*

*Katharine Chester for respondent-appellant.*

TIMMONS-GOODSON, Judge.

Respondent appeals the trial court order terminating his parental rights as to his two-year-old daughter ("T.D.P."). For the reasons stated herein, we affirm the trial court's order.

The facts and procedure pertinent to the instant appeal are as follows: On 17 September 2001, Cumberland County Department of Social Services ("DSS") filed a petition seeking termination of respondent's parental rights ("the petition"). DSS alleged that respondent neglected T.D.P., that respondent willfully left T.D.P. in foster care for more than twelve months without showing reasonable progress had been made to correct those conditions which led to T.D.P.'s removal, that respondent failed to pay a reasonable portion of

the cost of foster care for T.D.P. for six months prior to the petition although respondent was financially able to do so, and that respondent was incapable as a result of substance abuse to provide proper care and supervision for T.D.P. On 1 April 2002, the trial court entered an order terminating respondent's parental rights as to T.D.P. Respondent appeals.

_____

The issue on appeal is whether the trial court erred in terminating respondent's parental rights. Respondent argues that there was insufficient evidence to support the trial court's decision. We disagree.

"A termination of parental rights proceeding is a two-stage process." *In re Howell*, 161 N.C. App. 650, 656, 589 S.E.2d 157, 160 (2003). The trial court first examines the evidence and determines whether sufficient grounds exist under N.C. Gen. Stat. § 7B-1111 to warrant termination of parental rights. *Id.* The trial court's findings must be supported by clear, cogent, and convincing evidence. *Id.* at 656, 589 S.E.2d at 160-61. If the trial court determines that any one of the grounds for termination listed in § 7B-1111 exists, the trial court may then terminate parental rights consistent with the best interests of the child. *Id.* at 656, 589 S.E.2d at 161. The trial court's decision to terminate parental rights is discretionary, and "this Court 'should affirm the trial court where the court's findings of fact are based upon clear, cogent and convincing evidence and the findings support the conclusions of law.' " *In re Yocum*, 158 N.C. App. 198, 203, 580 S.E.2d 399, 403 (quoting *In re Allred*, 122 N.C. App. 561, 565, 471 S.E.2d 84, 86 (1996)), *aff'd per curium*, 357 N.C. 568, 597 S.E.2d 674 (2003).

In the instant case, the trial court made the following pertinent findings of fact:

X.

The Respondent Father is currently incarcerated in the North Carolina Department of Corrections. He is incarcerated upon convictions of common law robbery and second degree kidnapping. Respondent Father's earliest release date is November 2003 and his maximum release date is January 2004.

. . . .

XII.

Respondent Father is employed at the prison unit as a cook. He earns very little money. He has used his money to buy personal

items but has not sent any money for the minor child, nor has he even sent her a card.

Based upon these findings, the trial court made the following pertinent conclusions of law:

> That the juvenile has been placed in the custody of the Cumberland County Department of Social Services for a continuous period of six months next preceding the filing of the petition and the Respondent Father has willfully failed for such period to pay a reasonable portion of the cost of care for the juvenile although physically and financially able to do so pursuant to NCGS § 7B-1111(a)(3).

> . . . .

> That grounds exist for termination of the parental rights of the Respondent Father.

Respondent argues that the trial court's conclusion to terminate his parental rights pursuant to N.C. Gen. Stat. § 7B-1111(a)(3) (2003) was not supported by a finding of fact based upon clear, cogent, and convincing evidence. We disagree.

As respondent correctly points out, "[a] finding that a parent has ability to pay support is essential to termination for nonsupport" pursuant to N.C. Gen. Stat. § 7B-1111(a)(3). *In re Ballard*, 311 N.C. 708, 716-17, 319 S.E.2d 227, 233 (1984). Respondent first asserts that the trial court erred in failing to make such a finding. However, finding of fact number twelve clearly evidences that the trial court found that respondent had an ability to pay. Therefore, respondent's assertion is without merit. Furthermore, respondent's assertion that a support order is necessary to require him to pay a portion of the cost of T.D.P.'s foster care is also without merit. *See In re Wright*, 64 N.C. App. 135, 139, 306 S.E.2d 825, 827 (1983) ("Very early in our jurisprudence, it was recognized that there could be no law if knowledge of it was the test of its application. Too, that respondent did not know that fatherhood carries with it financial duties does not excuse his failings as a parent; it compounds them.").

Respondent's final assertion is that the trial court's finding of fact was unsupported by clear, cogent, and convincing evidence because respondent's failure to pay was not willful. Respondent contends that he lacked the means to pay any reasonable portion of the cost of T.D.P.'s foster care. Although respondent admits that he has worked

continuously while incarcerated, he also contends that because his wages ranged from only $.40 to $1.00 per day, it is unreasonable to require him to pay a portion of T.D.P.'s foster care. In support of this assertion, respondent cites *In re Clark*, where this Court stated that "[i]n determining what constitutes a 'reasonable portion' of the cost of care for a child, the parent's ability to pay is the controlling char- acteristic[,] [and] [a] parent is required to pay that portion of the cost of foster care . . . that is fair, just and equitable based upon the par- ent's ability or means to pay." 151 N.C. App. 286, 288-89, 565 S.E.2d 245, 247 (citations omitted) (quotations omitted), *disc. review denied*, 356 N.C. 302, 570 S.E.2d 501 (2002). While the foregoing quo- tations are correct statements of law, they fail to encompass our hold- ing in *Clark* or the law of this state regarding termination of parental rights pursuant to N.C. Gen. Stat. § 7B-1111(a)(3).

In *Clark*, as in the instant case, it was "undisputed that respond- ent . . . paid nothing to DSS for [his daughter's] care." *Id.* at 289, 565 S.E.2d at 247. Recognizing that "nonpayment constitutes a failure to pay a reasonable portion 'if and only if respondent [is] able to pay some amount greater than zero,' " we held that "[b]ecause there was no clear and convincing evidence that respondent had any ability to pay an amount greater than zero, the trial court erred in concluding that respondent failed to pay a reasonable portion of the cost of his child's care." *Id.* (quoting *In re Bradley*, 57 N.C. App. 475, 479, 291 S.E.2d 800, 802 (1982)).

In the instant case, there was clear and convincing evidence that respondent had an ability to pay an amount greater than zero. As dis- cussed above, the trial court noted that although respondent's wages were meager, he was nevertheless being paid for his work in the prison kitchen. Respondent therefore had an ability to pay some por- tion of the costs of T.D.P.'s foster care.

Although " '[w]hat is within a parent's 'ability' to pay or what is within the 'means' of a parent to pay is a difficult standard which requires great flexibility in its application,' " the requirement of § 7B-1111(a)(3) " 'applies irrespective of the parent's wealth or poverty.' " *In re Montgomery*, 311 N.C. 101, 113, 316 S.E.2d 246, 254 (1984) (quoting *In re Clark*, 303 N.C. 592, 604, 281 S.E.2d 47, 55 (1981)). "The parents' economic status is merely a factor used to determine their ability to pay such costs, but *their ability to pay* is the controlling characteristic of what is a reasonable amount for them to pay." *In re Biggers*, 50 N.C. App. 332, 339, 274 S.E.2d 236, 240 (1981) (emphasis added). Thus, because the trial court in the instant

case correctly found that respondent was able to pay some amount greater than zero during the relevant time period, we hold that sufficient grounds existed for termination of respondent's parental rights under N.C. Gen. Stat. § 7B-1111(a)(3). Therefore, we need not address respondent's arguments concerning other grounds for termination of his parental rights. *In re Pierce*, 67 N.C. App. 257, 261, 312 S.E.2d 900, 903 (1984). Furthermore, because we conclude that the trial court properly determined that grounds for termination existed under N.C. Gen. Stat. § 7B-1111(a)(3), we also hold that the trial court did not abuse its discretion in finding that it was in T.D.P.'s best interest to terminate respondent's parental rights. *In re Becker*, 111 N.C. App. 85, 97, 431 S.E.2d 820, 828 (1993). Respondent's assignments of error are therefore overruled.

Affirmed.

Judge McCULLOUGH concurs.

Judge WYNN dissents.

WYNN, Judge dissenting.

A poor man with no living immediate family members who is incarcerated for longer than 12 months should face no greater risk of having his parental rights terminated for his child than a similarly incarcerated individual who has financial means. I respectfully disagree with the majority's conclusion that the trial court had clear, cogent and convincing evidence before it, as required by N.C. Gen. Stat. § 7B-1111, to support its findings and conclusions terminating the parental rights of T.D.P.'s father.

The uncontroverted facts indicate T.D.P. was born on 4 October 1999. Her father signed the birth certificate and was an active participant in her life. Indeed, the record shows that until his arrest on 9 February 2000, T.D.P.'s father maintained a loving and caring relationship with his daughter in the family home. His subsequent convictions for common law robbery and second degree kidnapping resulted in a prison term that ended in January 2004; but, the record shows that due to good behavior, his release date was changed to December 2003.

In November 1999, T.D.P.'s mother called DSS to relinquish her parental rights because she had a substance abuse problem and was unable to care for T.D.P. Shortly after contacting DSS, T.D.P.'s mother

**IN RE T.D.P.**

[164 N.C. App. 287 (2004)]

changed her mind; nonetheless, DSS began an investigation into T.D.P.'s care. The DSS social worker, Antoinette Howard, testified that during November 1999, T.D.P. did not appear to be sick or malnourished, was clothed and appeared to be happy. She also testified that even though T.D.P.'s father indicated he had issues with drug abuse in November 1999, the issues did not concern her enough to file an abuse and neglect petition.

T.D.P.'s father testified that he began using marijuana at an early age and that use escalated to cocaine in 1988. He stopped using cocaine in the early 1990s and did not use again until he started having problems with T.D.P.'s mother. Due to these problems, he testified, "and you know how some people go pick up a drink, I went and picked up that drug."

In April 2000, Ms. Howard contacted T.D.P.'s father regarding placement of T.D.P. while he was incarcerated. Since his parents were deceased and he did not have any siblings, he contacted his aunt who reared him to see if she could care for his daughter; but, she was unable to do so. As he did not have any other relatives whom he could recommend as potential caretakers of T.D.P., his daughter remained in foster care.

Through May 2001, T.D.P.'s father was incarcerated at Lumberton LCI, where he did not work. He attended a drug treatment program, DART, until he was sent to Avery Mitchell Correctional Center, located in the North Carolina mountains. Upon his arrival at Avery Mitchell in May 2001, he began working in the kitchen at the tray window. In this position he earned 40 cents a day. He sent letters to his daughter's social worker to inquire about her well-being and development. The social worker received the first letter in July 2001. Shortly before T.D.P.'s second birthday, he sent a second letter in October 2001. This letter, which arrived three days after T.D.P.'s birthday, professed his love for his daughter and indicated he could not afford to purchase a birthday card. Then, at Christmas, T.D.P.'s father arranged to have a Christmas gift sent to his daughter through the Angel Tree organization. Shortly thereafter in January 2002, the termination of parental rights hearing was held.

While incarcerated T.D.P.'s father called the social worker as often as possible to inquire about his daughter. As the inmates could not call social workers collect, T.D.P.'s father explained that he would have to request a meeting with the social worker assigned to the prison. Approximately one week to a week and a half later

**IN RE T.D.P.**

[164 N.C. App. 287 (2004)]

the social worker would call him to the office and allow him to call his daughter's social worker. During these conversations he would inquire about her well-being, her development, and the possibility of receiving pictures. The social worker acknowledged receiving letters, phone calls, and sending pictures to T.D.P.'s father at his request.

T.D.P.'s father stated that his goal during incarceration was to complete the drug treatment program, DART, make honor grade and then work release. He indicated he was eligible for honor grade in February 2002 and then in three to six months he would be eligible for work release. With the money he earned from work release, he hoped to save enough money for housing upon his release. He also regularly attended Narcotics Anonymous and Alcoholics Anonymous meetings at Avery Mitchell and he attended parenting classes.

T.D.P.'s father worked in the prison kitchen, where he earned 40 cents a day working at the tray window and, after being promoted to cook, he earned $1.00 a day. At the time of the hearing, he had $2.80 in his account. He had lost his cook position because he missed eight days in December 2001 due to his attendance at a court hearing in Fayetteville related to this case. With the money, he purchased toiletries—soap, toothpaste, deodorant, and toothbrushes.

At the time of the hearing, T.D.P.'s father was forty years old with a tenth-grade education. During his service in the U.S. Army from 1978-1983, from which he received two honorable discharges, T.D.P.'s father earned his GED. After leaving the army, from 1983-1991, he worked consistently at two different factories until those factories closed. Prior to his incarceration, he worked as a restaurant cook and the restaurant manager told him she would rehire him upon his release.

As indicated by the majority, in a termination of parental rights proceeding, the trial court's findings must be supported by clear, cogent, and convincing evidence. *See In re Howell*, 161 N.C. App. 650, 656, 589 S.E.2d 157, 160 (2003). Clear, cogent, and convincing evidence "is greater than the preponderance of the evidence standard required in most civil cases, but not as stringent as the requirement of proof beyond a reasonable doubt required in criminal cases." *In the Matter of D. Montgomery*, 311 N.C. 101, 109-10, 316 S.E.2d 246, 252 (1984). Based upon the facts of this case, I would conclude the trial court's findings and conclusions are unsupported by clear, cogent and convincing evidence.

First, the trial court concluded:

> the father has willfully left the juvenile in foster care or place-
> ment outside the home for more than 12 months without showing
> to the satisfaction of the court that reasonable progress under the
> circumstances has been made within 12 months in correcting
> those conditions which led to the removal of the juvenile pur-
> suant to NCGS § 7B-1111(a)(2).

As an initial matter, it should be noted that the Cumberland County
Department of Social Services has never identified any problematic
conditions which T.D.P.'s father needed to improve. Indeed, the social
worker testified that in November 1999, while T.D.P. was in her
father's care, DSS concluded the minor child was happy, healthy,
clothed and well-fed. Moreover, DSS did not find T.D.P.'s father's
admitted substance abuse warranted the filing of an abuse and
neglect petition. T.D.P.'s father testified that he admitted his drug use,
took steps to treat the problem, and indicated that he had not had a
drug problem since the early nineties. The uncontroverted evidence
indicates T.D.P.'s father was drug-free at the time of the hearing and
had voluntarily sought treatment by attending a drug treatment pro-
gram, Narcotics Anonymous and Alcoholics Anonymous meetings,
and parenting classes. He had remained infraction-free while incar-
cerated, was working in the prison kitchen, and had goals of achiev-
ing work-release status. Due to his good behavior, his release date
had been changed to an earlier date, December 2003. Thus, the only
condition that needed improvement was his incarcerated status. The
evidence indicates T.D.P.'s father was improving this condition by
maintaining good behavior.

The trial court also concluded:

> the juvenile has been placed in the custody of the Cumberland
> County Department of Social Services for a continuous period of
> six months next preceding the filing of the petition and the
> Respondent Father has willfully failed for such period to pay
> a reasonable portion of the cost of care for the juvenile al-
> though physically and financially able to do so pursuant to
> NCGS § 7B-1111(a)(3).

"In determining what constitutes a 'reasonable portion' of the cost of
care for a child, the parent's ability to pay is the controlling charac-
teristic. A parent is required to pay that portion of the cost of foster
care for the child that is fair, just and equitable based upon the par-

**IN RE T.D.P.**

[164 N.C. App. 287 (2004)]

ent's ability or means to pay. What is within a parent's 'ability' to pay or what is within the 'means' of a parent to pay is a difficult standard which requires great flexibility in its application." *In re Clark*, 151 N.C. App. 286, 288-89, 565 S.E.2d 245, 247 (2002). "Nonpayment constitutes a failure to pay a reasonable portion if and only if respondent is able to pay some amount greater than zero." *Id.*

In this case, T.D.P.'s father could not work while he was incarcerated in Lumberton, North Carolina. After his transfer to Avery Mitchell in May 2001, he was allowed to work in the kitchen at the tray window. From this employment, he earned 40 cents a day or $2.80 a week. With this money he purchased toiletries and other items to care for himself. He also used this money to purchase the two stamps he used to mail two letters, including the birthday letter, to his daughter's social worker.

The trial court found that:

Respondent Father is employed at the prison unit as a cook. He earns very little money. He has used his money to buy personal items but has not sent any money for the minor child, nor has he even sent her a card.

There is no indication in this finding that the trial court determined T.D.P.'s father had the ability to pay a reasonable portion of his daughter's care. Furthermore, as stated in *Clark*, "a parent is required to pay that portion of the cost of foster care for the child that is fair, just, and equitable based upon the parent's ability or means to pay." In my opinion, a person earning 40 cents a day in wages is incapable of paying a reasonable portion of a two-year old's care.

Moreover, as acknowledged by North Carolina's Child Support Guidelines, a parent should have the ability to care for one's self. Accordingly, our Child Support Guidelines include a self support reserve:

which ensures that obligors have sufficient income to maintain a minimum standard of living based on the 1997 federal poverty level for one person. For obligors with an adjusted gross income of less than $800, the Guidelines require, absent a deviation, the establishment of a minimum support order ($50).

At Respondent's daily wage, he would have to work two months in order to meet this minimum amount of support. Moreover, the uncontroverted evidence indicates Respondent used his minimal wages to

purchase toiletries and other items to care for himself. Given that Respondent earned a dollar or less per day, never had more than $7.00 in his account and used this money to care for basic needs, I would conclude the clear, cogent and convincing evidence indicates T.D.P.'s father did not have the means or ability to pay a reasonable portion of his daughter's foster care.

The trial court also concluded "the Respondent Father has willfully abandoned the juvenile for at least six consecutive months immediately preceding the filing of the petition pursuant to N.C. Gen. Stat. § 7B-1111(a)(7). "Abandonment implies conduct on the part of the parent which manifests a willful determination to forego all parental duties and relinquish all parental claims to the child. It has been held that if a parent withholds his presence, his love, his care, the opportunity to display filial affection and willfully neglects to lend support and maintenance, such parent relinquishes all parental claims and abandons the child. The word willful encompasses more than a mere intention, but also purpose and deliberation." *In re McElmore*, 139 N.C. App. 426, 533 S.E.2d 508 (2000). As explained in *McElmore*, the court is required "to consider, during the relevant six month period, the financial support respondent has provided to the child, as well as the respondent's emotional contributions to the child. . . . A mere failure of the parent of a minor child in the custody of a third person to contribute to its support does not in and of itself constitute abandonment. Explanations could be made which would be inconsistent with a willful intent to abandon." *Id.*

The relevant six month period in this case is March-September 2001. Between March 2001 and May 2001, Respondent was incapable of contributing financially to his daughter's care as he did not have any income. Moreover, I would conclude that upon earning money, he did not have the ability or means to contribute reasonable support to his daughter. As for emotional support, during the relevant time period, Respondent sent letters, including a birthday letter, although it was financially difficult to do so. Respondent also called the social worker to inquire about his two-year old daughter's well-being and development. He arranged for a charitable organization to send his daughter a Christmas present. Indeed, the social worker testified Respondent would write or call and indicated she had been contacted by the Angel Tree organization. T.D.P.'s father also expressed his love for his daughter and his desire to visit with her. Accordingly, the uncontroverted clear, cogent and convincing evidence does not support the conclusion Respondent willfully abandoned his daughter.

**IN RE T.D.P.**

[164 N.C. App. 287 (2004)]

Finally, the trial court concluded Respondent was incapable of providing for the proper care and supervision of his daughter and that there was a reasonable probability that such incapability would continue for the foreseeable future. First, upon learning of T.D.P.'s placement in foster care and the mother's relinquishment of parental rights, T.D.P.'s father contacted relatives to see if anyone was able to care for his daughter. As both of his parents were deceased and he did not have any siblings, the only relative he could ask was his seventy year old aunt who raised him. As she was already taking care of other children, she was unable to care for T.D.P. Second, upon his release from prison in 2003, Respondent indicated he had a potential job with a restaurant as the restaurant manager stated she would rehire him upon his release from prison. Furthermore, he had carpentry skills and army training which could help in his job search. Respondent also indicated he was trying to obtain work release so he could save money for housing. Finally, it should be noted that the social worker testified there were two plans in place for the minor child—adoption or reunification with the father in January 2004 after his release from prison.

In sum, I believe the clear, cogent and convincing evidence in this case does not support the termination of T.D.P.'s father's parental rights. As stated by the attorney advocate for T.D.P. at the hearing:

> What a gentle spirit this man is. And certainly I can see the dilemma of the court, because I think that he truly does care for this child. There's no doubt in my mind. He's never had a child before and he was very honest and open, I think, on the witness stand. . . . If it had gone along and he and mom had split up, I think he probably would have done a good job with her . . .

In sum, there is little doubt that if T.P.D.'s father possessed wealth, his parental rights to his daughter would have never been terminated. The record shows that he loves his daughter and greatly desires to care for her. As I stated at the beginning of this dissent, a poor man with no living immediate family members who is incarcerated for longer than 12 months should face no greater risk of having his parental rights terminated for his child than a similarly incarcerated individual who has financial means.