IN THE MATTER OF: J.J., T-a.J., T-e.J., Minor Children.
No. COA06-1299
Court of Appeals of North Carolina.
Filed February 6, 2007
This case not for publication
Duncan B. McCormick for Respondent-Appellant Mother.
Lisa Skinner Lefler for Respondent-Appellant Father.
Mecklenburg County Attorney, by Tyrone C. Wade, for Petitioner-Appellee Mecklenburg County Department of Social Services.
Elizabeth Myrick Boone for Guardian ad Litem.
McGEE, Judge.
C.J.I. (Respondent-Mother) and T.H.J. (Respondent-Father) (collectively, Respondents) are the parents of J.J., T-a.J., and T-e.J. (the children). Mecklenburg County Department of Social Services (DSS) filed petitions on 20 January 2006 to terminate Respondents' parental rights to each of the children. The petitions alleged two grounds for termination of parental rights: (1) that Respondents willfully left the children in foster care for more than twelve months without making reasonable progress under the circumstances to correct the conditions which led to the removal of the children; and (2) that Respondents left the children in DSS' custody for more than six months and willfully failed to pay a reasonable portion of the costs of care although physically and financially able to do so. The trial court heard five days of testimony, beginning on 24 April 2006. An order terminating the parental rights of Respondents was entered on 28 June 2006. Respondents appeal.
DSS filed a petition on 2 February 2004 alleging J.J., T-a.J., T-e.J., and Respondent-Mother's two other children, D.B. and J.I., to be neglected and dependent. The petition alleged: (1) that Respondent-Mother's husband, N.I., was physically abusive with Respondent-Mother and D.B.; (2) that N.I. was evading arrest by state and federal authorities; and (3) that Respondent-Mother was assisting N.I. The petition also alleged that Respondent-Mother had moved with the children several times to avoid N.I., but that N.I. had always found the family. DSS alleged that N.I. assaulted D.B. the last two times that he had located the family. DSS obtained non-secure custody of the five children on 4 February 2004 and placed the children in foster care. The children were adjudicated neglected and dependent on 6 April 2004.
Following the adjudicatory hearing, the trial court adopted a case plan between DSS and Respondent-Mother. Under the case plan, Respondent-Mother agreed to complete an assessment for substance abuse and mental health issues, and to comply with the resulting recommendations. Respondent-Mother also agreed to complete parenting classes and mental health counseling, to resolve her criminal charges, to refrain from further criminal activity, and to obtain and maintain appropriate housing and employment.
The children exhibited symptoms of attention deficit disorder and depression while in DSS' custody, and were treated for these disorders. The two boys were physically aggressive and simulated sexual acts with each other, and with their younger sister. These behaviors lessened after the children were placed in foster care.
The evidence presented at the termination hearing tended to show that Respondent-Mother was convicted of communicating threats, and began serving an active sentence for a probation violation in June 2004. Respondent-Mother was placed on a work release program in October 2004. Her work release was revoked in January 2005 because she was found in possession of a cell phone, cell phone charger, and another individual's checkbook, in violation of the program's rules. Although Respondent-Mother was previously eligible for release in February 2005, as a result of the work release violations, she was incarcerated until June 2005.
While incarcerated, Respondent-Mother participated in several self-improvement programs. Melissa Mummert (Mummert), a domestic violence educator working in the Mecklenburg County jail, testified that Respondent-Mother was an active participant in the domestic violence sessions Mummert taught, and that Respondent-Mother requested permission to attend more than the four sessions required for all inmates. Mummert said Respondent-Mother shared her experiences with the other women in the class, "was pretty outspoken[,]" and "acted as . . . sort of a mentor to the othergirls in the class."
Diane Moore (Moore), who taught a voluntary life skills class in the Mecklenburg County jail, testified in detail about the topics covered in her classes, but indicated she did not recall much about Respondent-Mother, except that Moore liked her. Sandra Willoughby (Willoughby), a counselor of inmates in the Mecklenburg County jail, also testified, but admitted she did not have "any real specific memories" of Respondent-Mother. Willoughby stated, "I have no recollection of anything negative [with respect to Respondent-Mother.] My general recollection is that she was an active participant, but I cannot speak to anything more specific." After Respondent-Mother was released from jail, she began mental health therapy with Dr. Russell Hancock (Dr. Hancock). Dr. Hancock testified that Respondent-Mother attended twenty-seven of the forty-one sessions she scheduled with him. The treatment plan Dr. Hancock and Respondent-Mother created focused on self-esteem and anger management. Respondent-Mother did not provide Dr. Hancock with a copy of her case plan or any court orders in the juvenile case. Dr. Hancock stated that "the focus [was] not about [Respondent-Mother] as a parent, but [Respondent-Mother] as an individual."
Lisa Womack Nesbit (Nesbit), a social worker at the Mecklenburg County Women's Commission, testified that Respondent-Mother completed a domestic violence assessment on 3 May 2004, and began group sessions on 15 June 2004. Due to her incarceration, Respondent-Mother did not complete the program until 18 October 2005, but ultimately, she completed all twelve sessions. Nesbit testified that Respondent-Mother "was always active . . ., supportive of peers and able to share experiences with others."
Reneisha Black (Black), a family educator at the Family Center, testified that Respondent-Mother enrolled in parenting classes on 19 July 2005 after being referred by DSS, and that Respondent-Mother successfully completed the seven-week program. Black remembered Respondent-Mother as being vocal in class, and as being a positive influence on the class.
T-e.J. testified that while he was living with his maternal grandmother and step-grandfather (the Washingtons), he and his siblings stayed overnight with Respondent-Mother. He testified that Respondent-Mother would return the children to the Washingtons so the children could be taken to school.
Lisa Looby (Looby), the children's DSS social worker, testified that Respondent-Mother had not complied with her case plan. Looby stated that Respondent-Mother resisted making an appointment for a mental health assessment. Looby also said Respondent-Mother failed to sign a release form to permit DSS to share information with Respondent-Mother's therapist about DSS' involvement with Respondent-Mother until ordered to do so by the court in September 2005. Looby testified that Respondent-Mother had failed to maintain regular contact with DSS after her release from jail and had failed to provide DSS with proof of employment, or of appropriate housing.
Looby noted that the children were placed with the Washingtonson 8 June 2005. After Respondent-Mother was released from incarceration, DSS began to allow telephone contact with the children. The telephone contact continued while the children were with the Washingtons. DSS also authorized limited supervised visitation beginning in September 2005. Looby characterized the visits she witnessed as "pretty chaotic." DSS placed the children back into foster care on 18 November 2005 "[b]ecause [DSS] learned that the children had been returned to [Respondent-Mother]" without the knowledge or authorization of DSS. Visitation with Respondent-Mother ceased. Looby also testified that in the six months which preceded the filing of the petition to terminate, DSS had spent $15,092.91 to care for the children and had received no support from either Respondent. Looby testified she believed that termination of Respondents' parental rights was in the best interests of the children because the children responded very well to consistency and stability when it was provided for them.
Respondent-Father ceased living with Respondent-Mother sometime in 1997, prior to the removal of the children from Respondent-Mother's custody. Respondent-Father testified that although he stopped living with Respondent-Mother, he remained active in the children's lives by financially supporting Respondent-Mother and making sure the children had the things that they needed. Respondent-Father testified that after relocating to North Carolina in 1993, he had been incarcerated numerous times for short periods, but that he had remained involved with the children at all times when he was not incarcerated. In 2001, Respondent-Father was convicted of felony robbery with a dangerous weapon, and remains incarcerated with a projected release date in 2013.
Respondent-Father testified that since the neglect petition was filed in 2004, he has had no physical contact with the children. He also testified that since 2004 he had been in contact with the children by telephone, but "[n]ot that often[.]" He also testified that he had written "a couple of letters." Although Respondent-Father said he sent the children cards, he admitted that he had not done so in 2006.
Respondent-Father testified that while incarcerated, he participated in a ninety-day drug assessment treatment program, a twelve-week anger management program, and a stress management program. He did not offer into evidence any certificates of completion from those programs.
Looby testified that Respondent-Father contacted her once to request permission to write to the children, but that she had not had contact with him since July 2004. She testified she received no response to two letters she sent to him, one asking for permission to give J.J. a haircut, and another requesting information about potential relative placements for the children.

I. Respondent-Mother's Appeal
Respondent-Mother challenges certain findings of fact made by the trial court. We must determine whether each finding of fact is supported by clear, cogent, and convincing evidence. In re Huff, 140 N.C. App. 288, 291, 536 S.E.2d 838, 840 (2000), disc. review denied, 353 N.C. 374, 547 S.E.2d 9 (2001). We conclude that one of the trial court's findings of fact was not sufficiently supported by the evidence. However, because that finding was unnecessary for the trial court to find that Respondent-Mother willfully failed to pay a reasonable portion of the cost of care, we affirm the trial court's order terminating Respondent-Mother's parental rights.
Respondent first challenges the trial court's finding that her visits with Dr. Hancock were "sporadic." At the termination hearing, Dr. Hancock testified that Respondent-Mother had scheduled forty-one appointments and that she appeared at twenty-seven appointments. Dr. Hancock stated Respondent-Mother's attendance was sometimes, but not always, consistent. He stated "there are . . . weeks on end [when Respondent-Mother] makes it, but then there are times when [Respondent-Mother] doesn't come consistently." We find this testimony sufficient to support the trial court's finding that Respondent-Mother's appearance at counseling sessions with Dr. Hancock was sporadic.
Respondent-Mother also argues that the trial court's finding of fact that she had not "engaged in mental health counseling to address the issues[] which led to placement of [the] children in custody" was not supported by clear, cogent, and convincing evidence. Dr. Hancock testified that when he initially met with Respondent-Mother to formulate a treatment plan, she indicated she needed to work on her self-esteem and anger management. Respondent-Mother did not provide Dr. Hancock with a copy of her case plan or any court orders in the juvenile case. Dr. Hancock testified that he was "unaware that DSS was involved with her case"when he and Respondent-Mother devised her treatment plan, and that Respondent-Mother did not inform him of DSS' concerns regarding the children. He also said he later learned that a petition to terminate Respondent-Mother's parental rights had been filed, but was not sure whether he learned that from Respondent-Mother or from Looby. Dr. Hancock also stated that "the focus [was] not about [Respondent-Mother] as a parent, but [Respondent-Mother] as an individual." We find the trial court's finding of fact supported by clear, cogent, and convincing evidence.
Respondent-Mother also challenges the trial court's finding of fact that Respondent-Mother had participated in self-improvement programs while incarcerated, but "none of the supervisors of those programs had any recollection of her being an active participant." Respondent-Mother also challenges that portion of the finding that stated she had not "changed her dysfunctional attitude toward parenting or legal and social relationships that caused the children to come into foster care."
Mummert testified that Respondent-Mother was an active participant in the domestic violence classes Mummert taught. Mummert said Respondent-Mother shared her experiences with the other women in the class, "was pretty outspoken[,]" and "acted as . . . sort of a mentor to the other girls in the class." Moore and Willoughy did not specifically remember Respondent-Mother's participation; however, we cannot say this portion of the finding is supported by clear, cogent, and convincing evidence. However, this finding of fact does not affect the sufficiency of the trialcourt's findings with respect to Respondent-Mother's willful failure to pay a reasonable portion of the children's cost of care, so this erroneous finding does not affect the trial court's order terminating Respondent-Mother's parental rights.
Additionally, testimony supports the trial court's finding that Respondent-Mother had not changed her dysfunctional attitude toward parenting and legal and social relationships. Respondent-Mother testified that to obtain a divorce from N.I. from the State of New York, she falsely stated that she did not know where N.I. was "so that the divorce could go through quickly and smoothly[.]" Respondent-Mother said she knew her action was wrong, but did it anyway. Further, T-e.J. testified that Respondent-Mother had allowed the children to stay overnight with her while the children were placed with the Washingtons. These actions support the trial court's finding that Respondent-Mother continued to display a dysfunctional attitude toward parenting and legal and social relationships. We conclude that there was clear, cogent, and convincing evidence to support this finding.
Respondent-Mother next challenges the trial court's findings of fact that the children had been returned to her care while placed with the Washingtons, specifically, findings of fact nineteen and twenty. T-e.J.'s testimony provided direct support for these findings. T-e.J. testified that while he and his siblings were placed with the Washingtons, they stayed overnight at Respondent-Mother's house, and that Respondent-Mother would drive the children back to the Washingtons' home so Mrs. Washington could take them to school. Looby's testimony echoed T-e.J.'s testimony. Although Respondent-Mother denied that the children had been returned to her care, this testimony is sufficient to support the trial court's findings of fact.
Respondent-Mother also challenges the trial court's finding that she paid no child support in the six months prior to the filing of the termination petition. In support of this argument, Respondent-Mother cites her testimony that she provided financial support directly to the Washingtons while the children were placed with them. Looby testified that Respondent-Mother had not paid any money to DSS during the six months prior to the filing of the termination petition. Respondent-Mother presented no evidence to demonstrate that she had made payments to DSS during the relevant time. We conclude the trial court's finding of fact was supported by clear, cogent, and convincing evidence.
Respondent-Mother next assigns error to the trial court's conclusion that Respondent-Mother willfully failed to pay a reasonable portion of the children's cost of care.
N.C. Gen. Stat. § 7B-1111(a)(3) (2005) provides that a trial court may terminate a parent's rights if
[t]he juvenile has been placed in the custody of a county department of social services, a licensed child-placing agency, a child-caring institution, or a foster home, and the parent, for a continuous period of six months next preceding the filing of the petition or motion, has willfully failed for such period to pay a reasonable portion of the cost of care for the juvenile although physically and financially able to do so.
In order to terminate a parent's rights under N.C.G.S. § 7B-1111(a)(3), a trial court must find that the parent had the ability to pay child support. In re T.D.P., 164 N.C. App. 287, 289, 595 S.E.2d 735, 737 (2004), aff'd per curiam, 359 N.C. 405, 610 S.E.2d 199 (2005). Ability to pay controls what constitutes a reasonable portion of the cost of foster care for a child, which a parent must pay. In re Clark, 303 N.C. 592, 604, 281 S.E.2d 47, 55 (1981). "A parent is required to pay that portion of the cost of foster care for the child that is fair, just and equitable based upon the parent's ability or means to pay." Id. A parent can fail to pay only if the parent had the ability to pay some amount greater than zero. T.D.P., 164 N.C. App. at 290, 595 S.E.2d at 738.
In the present case, the trial court found that Respondent-Mother was employed during the relevant six month period of time, and that she "had the means and ability to pay something toward the children's cost of care; however, [Respondent-Mother] paid nothing." Respondent-Mother testified that after her release, she was employed at a temporary agency, a Bob Evans restaurant, and a thrift store. There was clear and convincing evidence that Respondent-Mother was able to pay some amount greater than zero, but did not do so. Because we hold there was sufficient evidence to find this ground to terminate Respondent-Mother's parental rights, we need not address Respondent-Mother's arguments pertaining to the other grounds found by the trial court. In re Clark, 159 N.C. App. 75, 84, 582 S.E.2d 657, 663 (2003) ("[w]here we determine the trial court properly concluded that one ground exists to support the termination of parental rights, we need not address the remaining grounds.").
Lastly, Respondent-Mother argues the trial court abused its discretion by concluding that the best interests of the children would be served by terminating her parental rights. Specifically, Respondent-Mother argues the trial court failed to consider the criteria contained in N.C. Gen. Stat. § 7B-1110(a).
N.C. Gen. Stat. § 7B-1110(a) (2005) provides that when determining whether to terminate a parent's rights, the trial court shall consider (1) the age of the juvenile; (2) the likelihood the juvenile will be adopted; (3) whether termination will aid in accomplishing the permanent plan of the juvenile; (4) the bond between the parent and the juvenile; (5) the quality of the relationship between the proposed permanent placement of the juvenile and the juvenile; and (6) any relevant consideration. We review the trial court's decision to terminate a parent's rights for abuse of discretion. In re Nesbitt, 147 N.C. App. 349, 352, 555 S.E.2d 659, 662 (2001).
The trial court's detailed findings of fact reveal that the trial court considered the factors required by N.C.G.S. § 7B-1110(a). The trial court made specific findings referencing the age of each of the children, the facts leading up to removal of the children from Respondent-Mother's care, the efforts of DSS to place the children with their maternal grandparents, and the improvement in the children's behavior when their interaction with Respondent-Mother was limited. Based on the findings of fact made by the trial court after an extensive termination hearing, we can discern no abuse of discretion and therefore overrule this assignment of error.

II. Respondent-Father's Appeal
The trial court concluded that Respondent-Father willfully left the children in a placement outside the home for more than twelve months without showing reasonable progress and that Respondent-Father willfully failed to pay a reasonable portion of the cost of care for the children. Because we find the trial court correctly found that Respondent-Father willfully left the children in a placement outside the home without making reasonable progress under the circumstances, we need not reach his argument regarding willful failure to pay a reasonable portion of the costs of the children's care. Clark, 159 N.C. App. at 84, 582 S.E.2d at 663 ("[w]here we determine the trial court properly concluded that one ground exists to support the termination of parental rights, we need not address the remaining grounds.").
N.C. Gen. Stat. § 7B-1111(a)(2) (2005) provides that a trial court may terminate a parent's rights if
[t]he parent has willfully left the juvenile in foster care or placement outside the home for more than 12 months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of the juvenile. Provided, however, that no parental rights shall be terminated for the sole reason that the parents are unable to care for the juvenile on account of their poverty.
This Court has held that to terminate rights pursuant to this ground, the trial court must first determine by clear, cogent, and convincing evidence that the child has been willfully left in a placement outside the home for over twelve months, and second, that at the time of the hearing the parent has not made reasonable progress under the circumstances. In re O.C., 171 N.C. App. 457, 464-65, 615 S.E.2d 391, 396 (2005). "Willfulness is established when the respondent had the ability to show reasonable progress, but was unwilling to make the effort." In re McMillon, 143 N.C. App. 402, 410, 546 S.E.2d 169, 175, disc. review denied, 354 N.C. 218, 554 S.E.2d 341 (2001).
Although Respondent-Father was limited in what he could do to maintain a relationship with the children because he was incarcerated, he did very little. Respondent-Father was given permission to write to the children, but testified he only "wrote a couple of letters." Looby testified that the only contact Respondent-Father had with her was when he asked for permission to write to the children, and that he had not contacted her since July 2004. She also testified that he had not responded to a letter she sent to him requesting permission to give J.J. a haircut, or a second letter in which she inquired as to any relatives with whom the children might be placed. This Court has held that a general lack of involvement over two years is sufficient to find willful abandonment. In re Bluebird, 105 N.C. App. 42, 49, 411 S.E.2d 820, 824 (1992) (finding that the Respondent's "meager efforts did not effectuate any improvement in correcting the situation"). Because willfullness in the context of N.C.G.S. § 7B-1111(a)(2) is "something less than willful abandonment[,]" we find this evidence sufficient to support the trial court's finding that this ground existed. In re Bishop, 92 N.C. App. 662, 668, 375 S.E.2d 676, 680 (1989).
Finally, based upon the detailed findings of fact made by the trial court after an extensive termination hearing, we cannot conclude the trial court abused its discretion in determining that it was in the best interests of the children that Respondent-Father's parental rights be terminated.
Affirmed.
Chief Judge MARTIN and Judge WYNN concur.
Report per Rule 30(e).