IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-406

No. COA21-544

Filed 21 June 2022

Alamance County, No. 19JT139

IN THE MATTER OF:

L.M.B.

Appeal by respondent mother and respondent father from orders entered 17 May 2021 and 2 June 2021 by Judge Frederick B. Wilkins Jr. in Alamance County District Court. Heard in the Court of Appeals 22 February 2022.

*Ewing Law Firm, P.C., by Robert W. Ewing, for respondent-appellant mother.*

*Kimberly Connor Benton for respondent-appellant father.*

*Jamie L. Hamlett for petitioner-appellee Alamance County Department of Social Services.*

*Matthew D. Wunsche for the Guardian ad Litem.*

GORE, Judge.

## I.    Factual and Procedural Background

¶ 1    On 28 July 2019, the Burlington Police Department ("BPD") responded to a service call at the Knights Inn motel. When law enforcement arrived, respondent mother told the officer that respondent father had slapped her on the face and threw

a remote control at her, which struck the infant L.M.B ("Lilly") on the head.[1] Respondent mother had a visible bruise from the slap. The responding officer also noticed Lilly needed a diaper change and to be fed. Lilly was less than three months old at the time. Respondent father was charged with assaulting respondent mother.

¶ 2    The Alamance County Department of Social Services ("DSS") received a report about the family on 8 August 2019. The social worker had difficulty arranging a meeting with respondent parents. When the social worker met with respondent mother, she denied any domestic violence with respondent father or that he hit Lilly with a remote, but she agreed to have no contact with him pursuant to a no-contact order. Once the no-contact order was lifted, however, respondent parents began living together again.

¶ 3    On 3 September 2019, BPD received a service call at the Knights Inn for a child welfare check. When the responding officer spoke to respondent mother, she was "incoherent and said she had been up all night because she was concerned about snakes" in the motel room. Respondent father was asleep on the bed and difficult to wake up. It took several more minutes for respondent father to become coherent after officers woke him. Respondent father also told the officers that there were snakes in the motel room. Officers did not find any snakes in the room and contacted DSS.

---

[1] We use a pseudonym to protect the identity of the juvenile and for ease of reading.

¶ 4    DSS reported the motel room was in "complete disarray" and there was no appropriate place for Lilly to sleep. There were open food containers, feminine hygiene products on the floor, and no sheets on the bed.

¶ 5    On 20 September 2019, DSS filed a petition alleging Lilly was neglected and dependent. DSS alleged respondent parents believed there were snakes in the motel room where they lived with Lilly, although none were present. DSS requested respondent parents submit to a drug screen, but both declined. During a later Child and Family Team meeting, respondent parents denied substance misuse and continued to assert there were snakes in the motel room. Respondent parents agreed to a Temporary Safety Plan, which included placement with a maternal aunt and uncle. Respondent father later objected to the placement. A Rule 17 Guardian ad Litem was appointed for respondent father due to him suffering bipolar and depressive episodes and a traumatic brain injury from being struck in the head.

¶ 6    On 6 November 2019, the trial court adjudicated Lilly neglected and dependent. In the dispositional portion of the order, the trial court ordered respondent mother: 1) maintain sufficient employment; 2) obtain and maintain safe and stable housing; 3) utilize mental health services and undergo psychological assessment; 4) engage in substance abuse treatment and submit to drug screens; 5) participate in parenting and domestic violence classes; and 6) update DSS about her progress on her case plan. The trial court ordered respondent father to take similar

steps to achieve reunification, in addition to Substance Abuse Intensive Outpatient Program ("SAIOP") classes.

The trial court kept Lilly in her placement with the maternal aunt and uncle. The trial court granted respondent parents weekly supervised visits with Lilly. In a July 2020 order, the trial court expanded respondent parents' visitation.

In September 2020, the trial court entered an initial permanency planning order, which set a primary permanent plan of reunification and a secondary plan of adoption. The trial court again ordered specific steps towards reunification as outlined in its dispositional order. It further indicated visitation could expand to include unsupervised visits if there were no issues or concerns with visitation.

A subsequent November 2020 order suspended all unsupervised visits between respondent parents and Lilly. The trial court found that respondent parents had gone to the home of a known drug dealer, that respondent father had suffered a cardiac incident, and that respondent parents had submitted diluted urine samples for drug screens. At the hearing, respondent father interrupted respondent mother's testimony and attempted to direct her. The next permanency planning hearing was continued until January 2021, and the trial court changed the permanent plan to a primary plan of adoption with a secondary plan of reunification.

On 29 January 2021, DSS filed a motion to terminate respondent parents' parental rights to Lilly. As to both respondent parents, the motion alleged grounds

of neglect, willful failure to make reasonable progress, and willful failure to pay a reasonable portion of the cost of care. As to respondent father only, the motion also alleged dependency.

At the termination hearing, social worker Freddie Omotosho testified that Lilly came into DSS custody because of concerns about respondent parents' domestic violence, substance misuse, hallucinations, and lack of proper care and supervision. Respondent parents were ordered in the initial disposition to resolve their housing, mental health, substance abuse, and domestic violence issues to achieve reunification with Lilly. Ms. Omotosho testified in detail about respondent parents' lack of progress on their case plans. Social worker Madalyn Schulz, who received the case after Ms. Omotosho, similarly described respondent parents' difficulties in working with the services offered by DSS to complete the goals of their respective case plans.

Dr. Julianna Ludlam conducted psychological evaluations on both respondent parents, which were admitted at the termination of parental rights adjudication hearing. Dr. Ludlam described how both respondent parents denied the existence of domestic violence and substance misuse despite evidence to the contrary, including police reports from prior incidents. Dr. Ludlam testified she did not have "major concerns" about respondent mother's substance misuse, but that respondent father's frequent trips to the hospital "showed the extent of his potential substance abuse problem," in part because some addicts use the emergency department as a method

of obtaining prescription drugs.  Respondent parents described one another as great parents, and they did not recognize any issues in their relationship with Lilly. According to Dr. Ludlam, respondent mother's ongoing relationship with respondent-father and her continued defense of him placed Lilly "at higher risk."  Dr. Ludlam testified:

> So it was not my concern that either [respondent father] or [respondent mother] would purposefully, intentionally neglect or abuse their daughter.  It was clear to me that both parents love their daughter and want the best for her. My concerns were, at the time of the evaluation, that [respondent father's] use of substances could—for one, could either lead to her being neglected or being exposed to risky situations involving drug use or the aftermath of drug use.  I think that was my primary concern.

¶ 13    After hearing the evidence, the trial court adjudicated grounds to terminate respondent parents' parental rights based on neglect, willful failure to make reasonable progress, and willful failure to pay a reasonable portion of the cost of care. In a separate dispositional order, the trial court also concluded that termination of parental rights was in Lilly's best interests.  The dispositional order indicates that the matter was heard by Judge Fred Wilkins, but the order is signed "F. Wilkins by Bradley Reid Allen 6/1/21."

## II.    Standard of Review

¶ 14    A termination of parental rights proceeding consists of a two-stage process: adjudication and disposition.    N.C. Gen. Stat. §§ 7B-1109, -1110 (2020).    At

adjudication, the trial court examines the evidence and determines whether sufficient grounds exist under § 7B-1111 to authorize the termination of parental rights. § 7B-1109(e). The burden is upon the petitioner to demonstrate that grounds for termination exist, and the trial court's findings of fact must be based on "clear, cogent, and convincing evidence." § 7B-1109(f). "If the trial court determines that any one of the grounds for termination listed in § 7B-1111 exists, the trial court may then terminate parental rights consistent with the best interests of the child." *In re T.D.P.*, 164 N.C. App. 287, 288, 595 S.E.2d 735, 736-37 (2004); § 7B-1110(a).

¶ 15 "We review a trial court's adjudication under N.C.G.S.§ 7B-1111 to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law. The trial court's assessment of a juvenile's best interests at the dispositional stage is reviewed for abuse of discretion." *In re E.H.P.*, 372 N.C. 388, 392, 831 S.E.2d 49, 52 (2019) (quotation marks and citations omitted). The trial court's conclusions of law are subject to *de novo* review. *In re N.D.A.*, 373 N.C. 71, 74, 833 S.E.2d 768, 771 (2019). An abuse of discretion occurs "where the court's ruling is manifestly unsupported by reason or so arbitrary that it could not have been the result of a reasoned decision." *In re N.K.*, 375 N.C. 805, 819, 851 S.E.2d 321, 332 (2020).

¶ 16 "When the trial court is the trier of fact, the court is empowered to assign weight to the evidence presented at the trial as it deems appropriate. In this

situation, the trial judge acts as both judge and jury, thus resolving any conflicts in the evidence." *In re Oghenekevebe*, 123 N.C. App. 434, 439, 473 S.E.2d 393, 397 (1996) (citations omitted). "[O]ur appellate courts are bound by the trial courts' findings of fact where there is some evidence to support those findings, even though the evidence might sustain findings to the contrary." *In re Montgomery*, 311 N.C. 101, 110-11, 316 S.E.2d 246, 252-53 (1984) (citations omitted). "Where no exception is taken to a finding of fact by the trial court, the finding is presumed to be supported by competent evidence and is binding on appeal." *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991) (citations omitted). "Moreover, we review only those findings necessary to support the trial court's determination that grounds existed to terminate respondent's parental rights." *In re T.N.H.*, 372 N.C. 403, 407, 831 S.E.2d 54, 58-59 (2019) (citation omitted).

### III. Discussion

In the case *sub judice*, the trial court's adjudication order was based on finding grounds existed for terminating respondent parents' parental rights pursuant to § 7B-1111(a)(1), (2), and (3) by clear, cogent, and convincing evidence. Specifically, the trial court concluded as a matter of law that respondent parents had: (a) neglected Lilly within the meaning of § 7B-101 and there is a high likelihood of repetition of neglect if Lilly is returned to their care; (b) willfully left Lilly in foster care or placement outside the home for more than 12 months without showing to the

satisfaction of the court that reasonable progress under the circumstances had been
made in correcting those conditions which led to Lilly's removal, and respondent
parents' inability to provide care is not based upon their poverty; and (c) willfully
failed to pay a reasonable portion of the cost of care for Lilly although physically and
financially able to do so while Lilly was in DSS custody for a continuous period of six
months preceding the filing of the motion to terminate parental rights.

## A. Adjudication

¶ 18        We first address the third ground for termination, failure to pay a reasonable
portion of the cost of care. Pursuant to § 7B-1111(a)(3), a parent's rights can be
terminated if the parent willfully fails to pay, for six months preceding the filing of
the motion to terminate parental rights, a reasonable portion of the cost of care for
the juvenile although physically and financially able to do so. § 7B-1111(a)(3). DSS
filed its motion to terminate parental rights on 29 January 2021, and the relevant
six-month period to determine whether respondent parents had the ability to pay
their reasonable portion of the cost of care is from 29 July 2020 to 29 January 2021.

> Our Supreme Court has held that a finding that a parent
> has ability to pay support is essential to termination for
> nonsupport. However, this Court has further clarified that
> there is no requirement that the trial court make a finding
> as to what specific amount of support would have
> constituted a "reasonable portion" under the
> circumstances, and therefore that the only requirement is
> that the trial court make specific findings that a parent was
> able to pay some amount greater than the amount the

parent, in fact, paid during the relevant time period.
*In re N.X.A.*, 254 N.C. App. 670, 676, 803 S.E.2d 244, 248, (*purgandum*), *disc. rev. denied*, 370 N.C. 379, 807 S.E.2d 148 (2017).

¶ 19 Respondent parents selectively challenge several of the trial court's findings of fact as to each ground for termination. Regarding ground three, failure to pay a reasonable portion of the cost of care, they argue the trial court erred by failing to consider "in-kind" contributions they made in lieu of financial support and assert their lack of support was not willful. Respondent father also challenges findings of fact 88, 93 and 100, which indicate during the relevant six-month period, respondent parents provided zero dollars towards the cost of Lilly's care and made a conscious decision not to pay child support.

¶ 20 However, there are a total of 245 remaining unchallenged findings of fact which support the trial court's reasoning. The trial court made many uncontested findings of fact regarding child support which are binding on appeal. Some of those unchallenged findings include but are not limited to the following:

> 80. The Respondent Mother was employed throughout the majority of the life of the foster care case at K & W. During the start of COVID, the mother was laid off but received unemployment compensation.
>
> 81. The Respondent Mother then was employed through Goodwill. That employment was short term as the mother was terminated for stealing. She never informed the social worker she was terminated or why she was terminated.

82. The Respondent Mother then reported employment at Food Lion. The Respondent Mother testified that she works 30 hours a week at Food Lion. She had provided one paycheck stub from Food Lion which indicates that Respondent Mother works less than twenty hours a week.

83. The Respondent Father has received disability payments through the life of the foster care case. He was briefly employed through K & W.

84. In the dispositional order, the Respondent Parents were ordered to provide child support and instructed on how to get child support established. The mother could work with Child Support Enforcement/IVD. The father could establish a trust account. This was repeated in every review and permanency planning order.

. . .

86. During the relevant six-month period, neither parent made any effort to establish child support payments through the appropriate options.

87. During the relevant six-month period, the mother provided zero dollars towards the cost of care of the juvenile despite having the ability to pay more than zero.

. . .

89. The parents have provided items during visitation such as clothing, toys, diapers and wipes. *There was no prior agreement between the parents and the Alamance County Department of Social Services that these items would be counted towards child support or offset their child support obligation.* In fact, during this period of time, there were *ongoing court orders requiring the parents to pay their reasonable portion of the cost of care of the juvenile.*

90. The mother is able-bodied and has been employed during the course of the foster care case and/or received

unemployment benefits.

91. The Respondent Mother has willfully failed to pay her reasonable portion for the cost of foster care during the relevant six-month period.

92. The Respondent Mother has willfully failed to pay her reasonable portion for the cost of foster care during the relevant six-month period.

. . .

94. In the relevant six-month period prior to filing of the motion to terminate parental rights, the parents paid zero towards the cost of care for [Lilly].

. . .

97. In March of 2021, the Respondent Mother completed a Voluntary support Agreement. It required her to pay $50.00 a month effective March 1, 2021. The mother has made one payment.

. . .

99. After filing of the motion to terminate parental rights, the Respondent Father paid $300.00 into a trust account established by the Alamance County Department of Social Services for the benefit of [Lilly].

. . .

101. Further, during a Child and Family Team Meeting, the Respondent Mother stated that her attorney advised her not to worry about paying child support. This further indicates a deliberate decision by the mother not to pay child support despite a court order requiring such payments.

102. The Alamance County Department of Social Services has expended funds for the cost of care of the juvenile.

¶ 21 Here, the uncontested findings support the trial court's adjudication finding grounds for termination of parental rights based on failure to pay a reasonable portion of the cost of care. These findings indicate respondent mother was employed throughout most of the life of the case and received unemployment benefits when she lost her job. Respondent father also received disability payments and was briefly employed. Respondent parents were ordered to establish child support and they failed to do so.

¶ 22 Respondent mother cites *In re J.A.E.W.*, 375 N.C. 112, 117, 846 S.E.2d 268, 271 (2020), for the proposition that a trial court is required to consider "in kind" contributions as a form of support. However, *In re J.A.E.W.* contains no such holding. This argument is premised upon one sentence, "[The respondent father] also did not buy [the juvenile] clothing or other necessities while she was in foster care." *Id.* In context, this statement simply reinforces the undisputed fact that the respondent father in that case failed to make any form of child support payment and failed to make any other contribution to the care of his child while she was in DSS custody. The *In re J.A.E.W.* decision does not require a trial court to consider items or gifts as a form of support.

¶ 23 In this case, the trial court specifically acknowledged respondent parents had provided "in kind" contributions in the form of clothing, toys, diapers, etc., during their visits, but there was no agreement in place that these items would offset their

support obligation. It was not error for the trial court to acknowledge these gifts but also determine they did not qualify as court ordered financial support payments for Lilly's care.

¶ 24        Thus, the trial court's adjudication order finding grounds existed for termination of parental rights pursuant to § 7B-1111(a)(3) was based on clear, cogent, and convincing evidence. Where there is sufficient evidence to support one ground of termination for respondent parents' parental rights, it is unnecessary for this Court to address the remaining grounds for termination. *See In re Moore*, 306 N.C. 394, 404, 293 S.E.2d 127, 133 (1982) ("If either of the three grounds aforesaid is supported by findings of fact based on clear, cogent and convincing evidence, the order appealed from should be affirmed."). Thus, we do not address respondent parents' remaining challenges to the trial court's adjudication pursuant to § 7B-1111(a)(1) and (2) for neglect and willful failure to make reasonable progress.

**B. Best Interests Determination**

¶ 25        Respondent mother has not challenged the trial court's determination that the termination of her parental rights would be in Lilly's best interest. Therefore, we affirm the trial court's termination order with respect to respondent mother. Respondent father does argue the trial court erred by finding it was in Lilly's best interests for his parental rights to be terminated. We address his arguments as follows.

Respondent father challenges findings of fact 12 and 28-31 of the dispositional order and reasserts his prior challenges to the findings of fact as adopted from the underlying adjudication order. However, most of his arguments do not allege the findings are unsupported by evidence, but that the trial court weighed the evidence improperly. In a termination of parental rights hearing, trial judge determines the weight to be given the testimony and the reasonable inferences to be drawn therefrom. If a different inference may be drawn from the evidence, the trial judge alone determines the credibility of the witnesses and which inferences to draw and which to reject. *In re Hughes*, 74 N.C. App. 751, 759, 300 S.E.2d 213, 218 (1985).

"After an adjudication that one or more grounds for terminating a parent's rights exist, the court shall determine whether terminating the parent's rights is in the juvenile's best interest." § 7B-1110(a).

> In each case, the court shall consider the following criteria and make written findings regarding the following that are relevant:
>
> (1) The age of the juvenile.
>
> (2) The likelihood of adoption of the juvenile.
>
> (3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
>
> (4) The bond between the juvenile and the parent.
>
> (5) The quality of the relationship between the juvenile and the proposed adoptive parent,

guardian, custodian, or other permanent placement.

(6) Any relevant consideration.

*Id.*

¶ 28    Here, the trial court properly adjudicated grounds for terminating respondent father's parental rights.  The dispositional order clearly states that the trial court "considered all factors as outlined" in § 7B-1110 and includes written findings addressing each of the relevant factors.  We further note that these findings are supported by competent evidence in the record. We conclude that the trial court did not abuse its discretion by determining that it was in Lilly's best interest to terminate respondent father's parental rights.  *See In re D.M.*, 378 N.C. 435, 440, 2021-NCSC-95, ¶ 11 (discerning no abuse of discretion where the trial court made written findings addressing each of the factors enumerated in § 7B-1110(a) and those findings were supported by competent evidence presented at the termination hearing).

## C. Valid Best Interests Order

¶ 29    In this case, Judge Bradley Reid Allen, Sr., signed the best interest order as follows: "F. Wilkins by Bradley Reid Allen, Sr., 6/1/21."  Respondent parents contend the trial court's order terminating their parental rights was invalid because the presiding trial judge, Frederick B. Wilkins, did not sign the best interests order.  We disagree.

¶ 30    North Carolina General Statutes Section 1A-1, Rule 52, governs findings by

the trial court in non-jury proceedings. Under Rule 52, the trial court is "required to do three things in writing: (1) To find the facts on all issues of fact joined on the pleadings; (2) to declare the conclusions of law arising on the facts found; and (3) to *enter judgment accordingly*." *Coggins v. Asheville*, 278 N.C. 428, 434, 180 S.E.2d 149, 153 (1971) (*purgandum*) (emphasis added). Pursuant to § 7B-804, these requirements apply to juvenile proceedings. Here, the presiding judge did not sign the termination of parental rights order upon entry of judgment.

However, Rule 63 provides a procedure to follow when a district court judge is unavailable:

> If by reason of death, sickness or other disability, resignation, retirement, expiration of term, removal from office, *or other reason*, a judge before whom an action has been tried or a hearing has been held is unable to perform the duties to be performed by the court under these rules after a verdict is returned or a trial or hearing is otherwise concluded, then those duties, *including entry of judgment*, may be performed:
>
> . . .
>
> (2) In actions in the district court, by the chief judge of the district, or if the chief judge is disabled, by any judge of the district court designated by the Director of the Administrative Office of the Courts.
>
> If the substituted judge is satisfied that he or she cannot perform those duties because the judge did not preside at the trial or hearing or for any other reason, the judge may, in the judge's discretion, grant a new trial or hearing.

§ 1A-1, Rule 63 (2020) (emphasis added). "The function of a substitute judge under

this rule is ministerial rather than judicial." *In re Savage*, 163 N.C. App. 195, 197, 592 S.E.2d 610, 611 (2004) (quotation marks and citations omitted).

¶ 32      Judge Allen did not sign the order in his own name, he signed it on behalf of Judge Wilkins, over a signature block with Judge Wilkins's name typed below. There is no indication in the record that Judge Allen made any substantive determinations in this case, and the written judgment is consistent with Judge Wilkins's oral rendering of judgment. Judge Allen signing the order on behalf of Judge Wilkins was a ministerial act consistent with the plain language of Rule 63.

## IV.    Conclusion

¶ 33      For the foregoing reasons, we affirm the trial court's adjudication and disposition orders terminating respondent parents' parental rights.


AFFIRMED.

Judges INMAN and ZACHARY concur.