682 S.E.2d 469 (2009)
In the Matter of S.C.H., Minor Child.
No. COA09-363.
Court of Appeals of North Carolina.
September 15, 2009.
*470 Elva L. Jess, Southport, for petitioner-appellee Brunswick County Department of Social Services.
Mary McCullers Reece, Smithfield, for respondent-appellant mother.
Sofie W. Hosford, Wilmington, for respondent-appellant father.
Pamela Newell Williams, Raleigh, for guardian ad litem.
ROBERT C. HUNTER, Judge.
Respondent-mother and respondent-father appeal the trial court's orders terminating their parental rights with respect to their child, S.C.H. Respondents primarily contend that the trial court erred in determining that grounds for terminating their rights existed. Because, however, the trial court's unchallenged findings of fact support it's conclusion that at least one basis for termination of parental rights exists, we affirm.

Facts
On 11 October 2004, the Brunswick County Department of Social Services ("DSS") filed a petition alleging that S.C.H. was a neglected and dependent juvenile. DSS alleged that it had received a referral stating that S.C.H. had tested positive for cocaine at birth. The petition stated that S.C.H. had been on a heart monitor since birth due to low birth weight and for observation. DSS alleged that both respondents had a long history of unaddressed drug abuse, and that respondent-mother had admitted to using illegal and prescription drugs. Respondents were also living in a home with a known drug user. Respondent-mother stated that she was "unable to care for the child financially," and DSS alleged that it could not assure the child's safety if released into respondents' care. DSS further asserted that there was no alternative child care arrangements available. The trial court granted DSS non-secure custody of S.C.H. On 2 June 2006, S.C.H. was adjudicated neglected by consent order, and custody was continued with DSS. The court ordered respondents to enter into a case plan and to comply with all of its recommendations.
A permanency planning review hearing was held on 20 September 2005. The trial court found that respondents had made "reasonable progress toward eliminating and alleviating many of the conditions that led to the removal of the juvenile from their care." The court continued custody with DSS, but authorized DSS to place the juvenile with respondents in accordance with a visitation schedule.
On 21 March 2006, the trial court held another review hearing. The trial court found: (1) respondent-mother had left S.C.H. in his bedroom, with the door closed, on at least two occasions, even though respondent-mother had been advised against this practice; (2) S.C.H., while in the care of respondent-mother, was found more than once with a wet diaper that was saturated, and it appeared that his diaper had not been changed regularly; (3) S.C.H. was found in his crib with dried vomit on his clothing; (4) despite being advised to not leave S.C.H. alone in his crib with a bottle due to concern of choking, respondent-mother continued this practice; (5) respondents had moved from their home without notifying DSS or the guardian ad litem; and (6) respondents' new residence contained numerous safety issues, which were not addressed until brought to respondents' attention by the guardian ad litem. The trial court determined that respondent-mother's conduct demonstrated that she "did *471 not fully learn from the in-home services that were previously provided and that additional services were necessary in order to safely provide for the child." The trial court continued custody with DSS and ordered that new services be put in place and that a new case plan be developed. The trial court further ordered that once services were in place, DSS was authorized to place S.C.H. with respondents, subject to strict monitoring by DSS and the guardian ad litem.
Subsequently, in a court summary prepared by DSS, it stated that: (1) respondent-mother had violated her probation by not paying her probation fees; (2) respondents had been evicted from their residence and moved out of the county; (3) respondents had tried to take the child out of daycare without permission; (4) respondents had failed to pass a parenting test and did not re-enroll in any parenting program; (5) respondent-father was not employed, and there was no indication he was seeking employment; and (6) respondents were not participating in any reunification services. DSS stated that it had provided services to respondents for twenty-four months and that these services had been "futile." Accordingly, DSS recommended that it be relieved of reunification efforts.
On 18 September 2007, DSS filed a petition to terminate respondents' parental rights. DSS alleged four grounds for termination: (1) S.C.H. was neglected within the definition of N.C. Gen.Stat. § 7B-101(15) (2007); (2) respondents had willfully left S.C.H. in foster care for more than twelve months without showing reasonable progress under the circumstances had been made in correcting those conditions that led to the child's removal; (3) respondents, for a continuous period of six months immediately preceding the filing of the petition, had failed to pay a reasonable portion of the cost of care for S.C.H. although physically and financially able to do so; and (4) respondents willfully abandoned S.C.H. for at least six consecutive months immediately preceding the filing of the petition.
Hearings were held on the petition to terminate respondents' parental rights on 9-10 December 2008 and 16 December 2008. The trial court determined that the first three grounds for terminating respondents' parental rights existed. The court further concluded that it was in S.C.H.'s best interests that respondents' parental rights be terminated. Respondents timely appealed from the orders terminating their parental rights with respect to S.C.H.

Discussion
Respondents first argue that the trial court erred in determining that grounds existed to terminate their parental rights. N.C. Gen.Stat. § 7B-1111 (2007) sets out the grounds for terminating parental rights. A finding of any one of the enumerated grounds is sufficient to support termination. In re Taylor, 97 N.C.App. 57, 64, 387 S.E.2d 230, 233-34 (1990). "The standard of appellate review is whether the trial court's findings of fact are supported by clear, cogent, and convincing evidence and whether the findings of fact support the conclusions of law." In re D.J.D., D.M.D., S.J.D. & J.M.D., 171 N.C.App. 230, 238, 615 S.E.2d 26, 32 (2005).
In this case, the trial court concluded that grounds existed pursuant to N.C. Gen. Stat. § 7B-1111(a)(2), which provides for termination of parental rights where:
The parent has willfully left the juvenile in foster care or placement outside the home for more than 12 months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of the juvenile....
To find grounds to terminate parental rights under N.C. Gen.Stat. § 7B-1111(a)(2), the trial court must perform a two-part analysis:
The trial court must determine by clear, cogent and convincing evidence that a child has been willfully left by the parent in foster care or placement outside the home for over twelve months, and, further, that as of the time of the hearing, as demonstrated by clear, cogent and convincing evidence, the parent has not made reasonable progress under the circumstances to correct the conditions which led to the removal of the child.
*472 In re O.C. & O.B., 171 N.C.App. 457, 464-465, 615 S.E.2d 391, 396 (internal citations omitted), disc. review denied, 360 N.C. 64, 623 S.E.2d 587 (2005).
Here, in support of its conclusion of law that grounds existed pursuant to N.C. Gen. Stat. § 7B-1111(a)(2) to terminate respondents' parental rights, the trial court found as fact:
28. Neither [respondent] provided any funds to [DSS] or the foster parents during the 2008 calendar year. The last time they provided any personal items for the child's benefit was in December 2007 when they delivered Christmas presents to him at a visit. They have not provided any cards or letters to him, although they know the address for [DSS].
....
46. The [respondents] were to participate in parenting classes. Both [respondents] attended the parenting sessions, but neither was able to pass the test at the end of the program. The [respondents] were asked to retake the test and the administrator, one Caroline Moore, was contacted by Diana Setaro who asked her to modify the test so that the questions could be asked orally, but neither [respondent] made arrangements to do so. Ms. Setaro advised both [respondents] to make contact with Ms. Moore.
....
50. The child was placed in the home for extended periods. On two occasions, after in home therapeutic services were in place, [DSS] had to remove the child from the home for safety concerns. At the time reunification was ceased by the Court, the child was not in the home full time.
....
56. [DSS] required the [respondents] to secure random drug screens, which were obtained from the [respondents] periodically. The December 10, 2004 drug screen came back positive for Benzodiazepines. The [respondents] were both being prescribed several medications that cause sedation, namely Percocet, Valium and Xanax.
57. At the Court ordered review held on March 22, 2005, the respondent father had not conformed to the requirements of the case plan regarding random substance abuse testing ....
58.... The Respondent parents were directed by the Wilmington Treatment Center to drug test on March 4, 2005 and failed to do so....
....
60. At the September 20, 2005 Permanency Planning Review Hearing, the juvenile had been regularly going for day visits. There were safety issues at the residence of the paternal grandmother regarding the location of a b.b. gun within reach of the juvenile.... At the time of the review, the parenting classes had neither been started nor completed. The crib which had been provided by an outside agency had been given back and the Respondent mother had also given away baby food.
....
65. The child was removed [from Respondents' care] on February 9, 2006 for the following reasons: The Respondent mother had refused help from Learning Perspectives. The child was left unsupervised in his crib awake with a bottle in a back bedroom with the door shut while the [respondent] mother was asleep. This occurr[ed] two days in a row. The child was in the crib with a dirty soiled diaper[ ] and had thrown up on himself. The Respondent father had lost another job and had started a new job. The Respondent mother had not seen her tutor since December 2, 2005 and would not allow the tutor to return. [Respondent-father] was not following up with screens at Southeastern Mental Health.... The [respondents] tested positive for Valium. The [respondents] moved into a new residence without first having [DSS] approve the residence which had many safety hazards at the time they moved in. The Respondent mother had not maintained contact with Mr. Berthiume who was providing therapy services in home and that she did not advise him of the move. The [respondents] did not have their own transportation. [Respondent-father] had not actively participated in any *473 in home services that were provided to the family.
66. On March 21, 2006, a review hearing was held. Between January 2006 and this review, the minor child ha[d] been found in the care of [respondent-mother] on more than one occasion with saturated wet diapers which did not appear to be regularly changed. He was found in his crib in his bedroom with vomit on his clothing that had dried and had not been changed. The Respondent mother was continually leaving the child alone in his crib with a bottle even after being advised of the risk of choking. The [respondents] had moved from their residence without notifying [DSS] or the Guardian Ad Litem. As noticed above, once their home was located there were numerous safety issues associated with this residence....
....
68. On February 28, 2006 the Guardian Ad Litem had observed the Respondent mother and the child at [DSS]. The Respondent mother had the juvenile for an unsupervised visit and at the time the Respondent mother and the juvenile were at [DSS] the juvenile's diaper was so full of fluid that it was leaking out on to his clothes.
69. On March 9, 2006 [respondent-mother] was observed at the residence between 10:30 and 11:00 a.m. and it appeared that she had been sleeping. She was very slow to answer the door after several knocks and she appeared to be unsteady on her feet and her speech was not clear. During the visit the juvenile was observed sitting in a crib in a bedroom with the door closed and the blinds drawn. He had a soiled diaper that smelled very strong and a bib that was covered with dried red chunky material. There was a bottle of milk laying in the crib. After several promptings by the Guardian Ad Litem the Respondent mother finally changed the child's diaper and put on clean clothes. As a result of this, the child was removed from the home and returned to foster care.
....
72. In August ... without notice to [DSS] or other service providers, [respondents] relocated and notified [DSS] [that] following their move that they could not participate in any services, nor was their home suitable for visitation, as it was only temporary. In that the Respondent mother has not been involved in treatment since August 30, 2006 and presented many challenges and struggles parenting the juvenile even with support in place.
....
74. Although [respondents] had taken the parenting class, they did not pass the final test in the parenting class. However, the intensive in home services with regard to parenting skills had been provided by Mr. Berthiume and the [respondents] had either discontinued that service and had not retained any of [the] skills that had been provided during the time that Mr. Berthiume was providing in home services.
75. The Respondent parents ha[d] moved out of the county without permission to a location not approved by [DSS]. It appeared that [respondent-father] has not secured the mental health evaluation which was required on his case plan. At the review in November 2006, the parents were not participating in any of the services that were to be provided to bring about reunification[.]
In addition to these findings, the trial court found that respondent-father was required to cease using alcohol. The court found, however, that respondent-father "occasionally drinks a cold beer. When he wants one, he'll buy it." Respondents do not challenge these findings, and, therefore, they are binding on appeal. See In re P.M., 169 N.C.App. 423, 424, 610 S.E.2d 403, 404-05 (2005) (concluding findings of fact not assigned as error or challenged in appellant's brief deemed binding on appeal); N.C.R.App. P. 28(b)(6).
Respondent-mother contends that the trial court failed to consider respondents' cognitive limitations with respect to its finding of willfulness. Compare In re Matherly, 149 N.C.App. 452, 454-55, 562 S.E.2d 15, 17-18 (2002) (holding trial court failed to consider age-related limitations as to willfulness). Despite respondents' cognitive limitations, their failure to provide personal items, cards or letters to the juvenile, and especially their *474 cessation of services required for reunification, were sufficient to show willfulness. See In re Oghenekevebe, 123 N.C.App. 434, 440, 473 S.E.2d 393, 398 (1996) (finding respondent willfully left child in foster care where she did not take advantage of DSS assistance with services such as counseling and parenting classes to improve her situation); In re Nolen, 117 N.C.App. 693, 699, 453 S.E.2d 220, 224 (1995) (holding parent's refusal to obtain treatment for alcoholism constituted willful failure to correct conditions that had led to removal of child from home). Accordingly, sufficient grounds existed for termination of respondents' parental rights under N.C. Gen.Stat. § 7B-1111(a)(2). As grounds exist pursuant to N.C. Gen.Stat. § 7B-1111(a)(2) to support the trial court's order, the remaining grounds found by the trial court to support termination need not be reviewed. Taylor, 97 N.C.App. at 64, 387 S.E.2d at 233-34.
We additionally note that the dissent maintains that the trial court failed to "address any of the plentiful evidence of [respondents'] cognitive difficulties[,]" suggesting that the trial court should have determined whether they were incapable of providing S.C.H. with necessary care. See N.C. Gen.Stat. § 7B-1111(a)(6). However, the petition to terminate respondents' parental rights did not contain any allegations that respondents were incapable of providing proper care and supervision for the juvenile. Thus, it would have been improper for the trial court to terminate respondents' parental rights on this basis. See In re C.W. & J.W., 182 N.C.App. 214, 228-29, 641 S.E.2d 725, 735 (2007) (holding trial court erred by terminating respondent's parental rights based on abandonment, which had not been alleged in petition).
Respondents next contend that the trial court erred in concluding that termination of their parental rights is in S.C.H.'s best interest. On finding the existence of a ground to terminate a parent's rights, a court must then decide whether termination is in the best interest of the child. In re Blackburn, 142 N.C.App. 607, 610, 543 S.E.2d 906, 908 (2001). This decision is within the discretion of the trial court and may be reviewed only for an abuse of discretion. In re Shermer, 156 N.C.App. 281, 285, 576 S.E.2d 403, 406-07 (2003). "A ruling committed to a trial court's discretion is to be accorded great deference and will be upset only upon a showing that it was so arbitrary that it could not have been the result of a reasoned decision." White v. White, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985).
The Juvenile Code sets out several factors the trial court must consider in determining whether termination of parental rights is in the best interest of the child:
(1) The age of the juvenile.
(2) The likelihood of adoption of the juvenile.
(3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
(4) The bond between the juvenile and the parent.
(5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
(6) Any relevant consideration.
N.C. Gen.Stat. § 7B-1110(a)(1)-(6) (2007). The trial court is directed to take action "which is in the best interests of the juvenile" when "the interests of the juvenile and those of the juvenile's parents or other persons are in conflict." N.C. Gen.Stat. § 7B-1100(3) (2007).
In this case, the trial court's dispositional order indicates that the court considered the factors required by N.C. Gen.Stat. § 7B-1110(a). First, the trial court made a specific finding referencing S.C.H.'s date of birth, and noted that his foster mother had "interacted with [S.C.H.] since his birth." The trial court additionally found:
4. [The foster parents] have two other children in their home, an eighteen year old son, and a three year old daughter, whom they recently adopted. [S.C.H.] has developed a warm, loving relationship with both of these children. When the [foster family] decided to become foster parents, their older son participated in the MAPP classes and has openly accepted the younger children in the home. [S.C.H.] and *475 [the three-year-old daughter] treat each other as normal siblingsthey fight together, they color together, they go fishing with their foster father, they use play doh to create things and they ride their bikes.
5. [The foster father] takes the children fishing.
6. When [the foster father] works in the yard, [S.C.H.] will help him.
7. [The foster mother] plays the violin and the children have taken an interest in playing as well. [The foster mother] has purchased violins for [the daughter] and [S.C.H.] for Christmas and paid for lessons for them beginning in January 2009.
8. [S.C.H.] has been observed by the Guardian ad litem on a number of occasions in the [foster family's] household. His interaction with [the daughter] and the foster parents is warm and affectionate.
....
11. [S.C.H.] receives occupational therapy and speech therapy. [The foster mother] has worked with the therapist to learn how to assist him in the home to improve his skills and to make modifications to help him. The child is currently in a pre-kindergarten program and is doing well in school.
12. That the juvenile is doing well in his placement and the environment has been appropriate and nurturing for the child. By all accounts, the child is progressing well in this home, considers the family `his' family and the other children in the home to be `his' siblings.
13. [The foster parents] are committed to the child and desire to adopt him.
14. That it is in the best interest of the minor child that the parental rights of [respondents] be terminated in order for the permanent plan of adoption to proceed.
Respondent-mother argues that the trial court made no findings as to the bond between herself and S.C.H. The dissent concludes that without a finding on this factor, it cannot be determined whether the court considered that factor as mandated by N.C. Gen.Stat. § 7B-1110 (a)(4). The dissent would, therefore, remand the matter for further findings.
Although the trial court may have not made a specific finding addressing N.C. Gen. Stat. § 7B-1110(a)(4), the trial court made multiple findings regarding the other enumerated factors. The trial court made findings as to the bond between S.C.H. and his prospective adoptive parents; the substantial progress made by S.C.H. while in foster care; the foster parents' plan to adopt S.C.H.; and that termination of respondents' parental rights would allow adoption to proceed.
Moreover, in light of the trial court's findings in its adjudication order that respondents last provided gifts to S.C.H. in December 2007; that they have not given any cards or letters to S.C.H.; and that they canceled two of the five visits granted by the trial court in October 2007, it is apparent that the trial court did consider the bond between respondents and S.C.H. We, therefore, conclude that the trial court's findings are not so deficient as to warrant a conclusion that its determination is manifestly unsupported by reason. See In re R.B.B., 187 N.C.App. 639, 648, 654 S.E.2d 514, 521 (2007) (holding trial court did not abuse discretion in terminating parental rights although there was not "[s]pecific [ ]" finding regarding bond between parent and child), disc. review denied, 362 N.C. 235, 659 S.E.2d 738 (2008); In re T.M., 182 N.C.App. 566, 577, 643 S.E.2d 471, 478 (2007) (finding no abuse of discretion based primarily on finding relating to likelihood of adoption by foster parents; no indication that trial court considered bond between parent and child), aff'd per curiam, 361 N.C. 231, 641 S.E.2d 302 (2007). Consequently, we affirm.
Affirmed.
Chief Judge MARTIN concurs.
Judge ELMORE dissents in a separate opinion.
ELMORE, Judge, dissenting.
For the reasons stated below, I respectfully dissent from the majority's opinion and would, instead, reverse the trial court's order terminating respondents' parental rights and remand for further proceedings.

*476 Background

The record paints a portrait of a couple who, despite considerable effort, cannot seem to pull things together enough to properly tend to their child. Both parents have histories of drug abuse and DSS initially removed S.C.H. because he tested positive for cocaine at birth. Afterwards, both parents made reasonable progress towards accomplishing the goals set out in their first family services agreement. Respondent mother, in particular, formed a close bond with S.C.H. and tried very hard to comply with her case plan and master the skills necessary to care for the infant. She attended and completed the required drug treatment program, completed her mental health assessment, kept a clean home stocked with items appropriate for S.C.H.'s extended home visits, worked with a literacy tutor, voluntarily subjected herself to unannounced visits by her parenting skills instructors, attended all visitations except when she could not obtain transportation, and attended all court hearings. She appeared to be the primary caregiver and was observed to be very engaged in the parenting process.
Respondent parents' principal problems, from the perspective of social workers and the guardian ad litem (GAL), were their cognitive impairments, their inability to obtain and maintain a single residence, their inability to obtain reliable transportation, and respondent father's inability to obtain permanent employment. Respondent mother has been on disability social security income since she was sixteen years old and receives a monthly payment of $637.00. She does some seasonal work cleaning houses during the summer and earned approximately $350.00 per month during June, July, and August of 2008. Respondent father earns an average monthly income of $302.00. Not surprisingly, they have had difficulty maintaining independent housing on this budget, although, as of the date of the termination order, they were current on all of their obligations except respondent father's probation fees, which totaled $630.00.[1]
Respondent mother has consistently tested in the mild mental retardation range, and various case workers have speculated that respondent father is similarly impaired, although he has not submitted to testing. Respondent father has a battery of health conditions, including diabetes, which he has treated on an emergencyrather than ongoingbasis, apparently because he cannot afford regular preventive care. Both parents suffer from a "nerve disorder" or "anxiety," although there are no medical records in the record on appeal; both are prescribed Valium to treat the condition. These mental and physical limitations are likely contributing to the couple's low income, which, in turn, is responsible for their inconsistent housing and transportation.

Facts and Procedural History
The following facts are undisputed: S.C.H. was adjudicated a neglected juvenile on 1 November 2004 when the parents "acknowledged and admitted that [he] was in substantial risk of serious injury by other than accidental means as he tested positive for cocaine at birth." Respondent parents participated in review hearings, permanency planning hearings, and permanency planning review hearings while S.C.H. was in the custody of the Brunswick County Department of Social Services (DSS). They signed an Out of Home Family Services Agreement on 5 November 2004, with a goal of reunification. The 2004 agreement required respondent parents to secure substance abuse assessments, participate in random drug tests, participate in AA and NA meetings, and complete a Home Again Services program. The district court found as fact that respondent parents secured substance abuse assessments and completed the Home Again Services program. A 10 December 2004 drug screen came back positive for benzodiazepines, although both parents had valid prescriptions for Percocet, Valium, and Xanax. Respondent parents failed to appear for a drug test on 4 March 2005. At this point, respondent mother "had completed most of what had been required in her case plan" and S.C.H. was having overnight visits in respondent parents' home on a regular basis. Following a 22 March 2005 review, *477 the district court found that respondent father had not complied with the required random substance abuse testing, but that respondent mother was attending substance abuse meetings.
By the 28 June 2005 review, respondent parents had been evicted once and moved twice, but had resumed extended visits with S.C.H. Respondent father had begun drug treatment and respondent mother had completed her drug treatment and was cooperating with in-home services. The district court authorized DSS to place S.C.H. in respondent parents' home "so long as they continued to comply with the family services case plan, although legal and physical custody was to remain with" DSS. When the district court reviewed the permanency plan in September 2005, respondent parents were living with respondent father's mother and using her car for transportation. S.C.H. had been regularly visiting respondent parents and respondent father was continuing his drug treatment. However, he missed five or six appointments because of complications from his untreated diabetes. Both parents followed all of the recommendations of the substance abuse assessment except stopping their use of prescribed Valium.
At the 31 October 2005 review hearing, the trial court authorized DSS to place S.C.H. back in respondent parents' home so long as they continued to comply with the terms and conditions of their family services case plan because they "had made reasonable progress towards eliminating or alleviating conditions which had led to" S.C.H.'s removal from the home. S.C.H. "appeared to be safe and well cared for" and respondent mother was appropriate with him during the weekly in-home services provided by Jeff Berthiume. Respondents were being tutored by the literacy council and respondent father was working "off and on" for Lee Steel. However, respondents' transportation, lack of permanent residence, and lack of full-time permanent employment continued to be at issue.
In January 2006, respondents moved to a new rented trailer without first receiving permission from DSS. Social worker Setaro visited the home on 1 February 2006 and filled out a checklist of safety conditions to be corrected. Ms. Setaro determined that respondent mother had dismissed the literacy tutor in December 2005. Several weeks later, DSS noted that respondents had addressed all of the safety conditions.
On 9 February 2006, DSS removed S.C.H. from respondent parents' home for the following reasons, as summarized by the trial court:
The Respondent mother had refused help from Learning Perspectives. The child was left unsupervised in his crib awake with a bottle in a back bedroom with the door shut while the mother was asleep. This occurring two days in a row. The child was in the crib with a dirty soiled diapers [sic] and had thrown up on himself. The Respondent father had lost another job and had started a new job. The Respondent mother had not seen her tutor since December 2, 2005 and would not allow the tutor to return. [Respondent father] was not following up with screens at Southeastern Mental health. There was sufficient income at that time from the Respondent mothers [sic] S.S.I. check to cover expenses. The parents tested positive for Valium. The parents moved into a new residence without first having [DSS] approve the residence which had many safety hazards at the time they moved in. The Respondent mother had not maintained contact with Mr. Berthiume who was providing therapy services in home and that she did not advise him of the move. The parents did not have their own transportation. [Respondent father] had not actively participated in any in home services that were provided to the family.
Between S.C.H.'s removal and the 21 March 2006 review hearing, respondent mother visited S.C.H. at DSS and allowed his diaper to become so full of fluid that it leaked onto his clothes. The GAL visited respondent mother at home while S.C.H. was there and appeared to have been sleeping when the GAL arrived between 10:30 and 11:00 a.m. The district court further summarized,
She was very slow to answer the door after several knocks and she appeared to be unsteady on her feet and her speech was not clear. During the visit the juvenile was *478 observed sitting in a crib in a bedroom with the door closed and the blinds drawn. He had a soiled diaper that smelled very strong and a bib that was covered with dried red chunky material. There was a bottle of milk laying in the crib. After several promptings by the Guardian Ad Litem the Respondent mother finally changed the child's diaper and put on clean clothes.
As a result, DSS removed S.C.H. and returned him to foster care.
Respondent parents entered into a new Out of Home Family Services Agreement on 3 April 2006. The 2006 agreement required that respondent father complete a mental health screening, and that both parents attend NA and AA meetings, secure mental health evaluations, attend parenting classes, work with Jeff Berthiumea provider of in-home servicesand participate with Learning Perspectives, an in-home services program. Both parents completed the parenting classes, but neither was able to pass the test at the end of the course. They were asked to retake the test and their social worker, Diana Setaro, asked the administrator to modify the test so that the questions could be asked orally. Neither parent contacted the administrator to retake the test.
Following a May 2006 review, S.C.H. was placed in the home three days per week. During each of those three days, a Learning Perspectives employee was present in the home for five hours to provide assistance and guidance. As of the July 2006 hearing, respondent mother was cooperating with Mr. Berthiume's in-home services, but respondent father was not. Until 30 August 2006, respondent mother "was making some progress with the parenting skills being provided by Mr. Berthiume. She was exhibiting motivation to learn and retain parenting skills as well as being mindful of safety and nutritional issues for the juvenile."
However, after 30 August 2006, respondent parents moved to a new home without first notifying DSS. They had previously been living with respondent father's mother, but she passed away and ownership of her house vested in a bank. Respondents and DSS had previously discussed their eventual eviction after the grandmother became ill and DSS knew that respondents would have to leave the house immediately following the grandmother's death. Respondents informed DSS that their new home was temporary and not suitable for visitation, and that they could not participate in any services. By the 6 November 2006 hearing, neither respondent was participating in any of the services required for reunification with S.C.H. The trial court relieved DSS of any further reunification efforts. S.C.H. has been in foster care since then.
On 31 December 2008, in its adjudication order, the district court found that grounds existed for the termination of both respondents' parental rights pursuant to N.C. Gen. Stat. § 7B1111 (a)(1), (a)(2), and (a)(3). In its disposition order, the district court concluded that it was in the best interest of the child to terminate respondent parents' parental rights. I address each respondent's appeal separately.

Respondent Mother's Appeal

A. N.C. Gen.Stat. § 7B-1111(a)(2).
As the majority notes, respondent mother first argues that the trial court erred by concluding as a matter of law that she willfully left her son in foster care for more than twelve months without making reasonable progress under the circumstances to alleviate the conditions which led to the child's removal. I would agree with respondent mother and hold that the trial court's conclusion was not adequately supported. To make a finding pursuant to N.C. Gen.Stat. § 7B-1111(a)(2), the trial court must engage in a two-part analysis. First, it "must determine by clear, cogent and convincing evidence that a child has been willfully left by the parent in foster care or placement outside the home for over twelve months[.]" In re O.C. & O.B., 171 N.C.App. 457, 464-65, 615 S.E.2d 391, 396 (2005). Second, the court must determine whether, "as of the time of the hearing, as demonstrated by clear, cogent and convincing evidence, the parent has not made reasonable progress under the circumstances to correct the conditions which led to the removal of the child." Id. at 465, 615 S.E.2d at 396.

*479 A finding of willfulness does not require a showing of fault by the parent. Willfulness is established when the respondent had the ability to show reasonable progress, but was unwilling to make the effort. A finding of willfulness is not precluded even if the respondent has made some efforts to regain custody of the children.
Id. (quotations and citations omitted). "The standard for appellate review of the trial court's conclusion that grounds exist for termination of parental rights is whether the trial judge's findings of fact are supported by clear, cogent, and convincing evidence, and whether these findings support its conclusions of law." In re McMillon, 143 N.C.App. 402, 408, 546 S.E.2d 169, 174 (2001).
Respondent mother does not dispute that S.C.H. was in foster care for more than twelve months; she disputes that she left him in foster care willfully. She argues that she failed to pass the parenting class test because of her cognitive impairment, as indicated by her low IQ score. As part of her determination of disability, the Department of Health and Human Services conducted a psychological evaluation of respondent mother in 2001. The evaluation concluded that respondent mother's general level of intelligence appeared to fall in the Mild Mental Retardation range. She was "functioning overall in the Extremely Low Range of Intelligence with a Full Scale IQ of 65. Verbal IQ is 68, Performance IQ is 67, Verbal Comprehension Index is 72 and Perceptual Organization Index is 65." Her "grade equivalents were equal to the second grade." The evaluation included the following summary of the test results:
The claimant's ability to understand and respond to directions falls in the Mild Mental Retardation range of ability. Memory, sustain [sic] concentration and persistence are impaired due to her cognitive deficits. She is able to perform routine, repetitive tasks such as those required and [sic] taking care of her personal hygiene and her infant. The test results indicate the claimant would not be able to manage her own benefits in her best interest due to her cognitive deficits. Current IQ scores are felt to be valid and should remain consistent without further development of psychological, emotional or medical problems. No premorbid level is felt to have existed. Test results are felt to be consistent with the claimant's education, vocational background and social adjustment.
A 21 February 2006 guardian ad litem report included the following two concerns for the court:
 I have spent much time with [respondent mother] and [father] and feel they both have tried to the best of their ability to care for [S.C.H.] They love the child and have done most of the things requested of them in order to keep the child with them.
 The Guardian's concern is that they do not have the mental ability to care for this child on their own. Therefore I can not recommend he be returned to their care.
Respondent mother underwent a mental evaluation on 12 October 2006 as part of her reunification plan. The evaluator noted that respondent mother's general knowledge was poor and that her "[c]ognitive abilities appear[ed] consistent with prior estimates of functioning in a range consistent with mental retardation." However, respondent mother "reported high motivation to perform well due to the circumstances of the testing. She exerted considerable effort." The evaluator believed that the results accurately reflected respondent mother's abilities. Respondent mother scored slightly higher on the 2006 IQ test than she did on the 2001 test, which the evaluator noted was "unusual." Her overall IQ of 74 placed her in the borderline mentally retarded range, and she received scores of 77 for verbal reasoning abilities, 80 for verbal comprehension, 75 for performance IQ, and 78 for perceptual organization index. The evaluator noted that respondent mother's adaptive functioning scores were also in the extremely low to borderline range.
The evaluator related the following impression of respondent mother, following the testing:
[Respondent mother] expresses a significant desire to have her child returned to her custody. She states that she has been *480 complying with the court and Social Services. She reports a willingness to continue to do so. Highly motivated individuals with cognitive and adaptive skills in the range in which [she] scored may parent children successfully with sufficient family or natural supports. [She] also has the additional challenge of coping with substance abuse and mental illness. Evenso [sic], highly motivated individuals with such challenges may parent children successfully with significant support. Given the multiple challenges [she] faces it is unclear how she will be able to safely and successfully parent a child independently.
Respondent mother specifically disagrees with the following two findings of fact from the disposition order, arguing that they are not supported by clear, cogent, and convincing evidence:
36. There was no reason that the parents could not complete their parenting course and secure a passing test. When requested to participate in a modified, oral test, they made no arrangements to do so.
73. ... At the time of this hearing, the juvenile had been in foster care for two years and the parents continue to have struggles with concerns about learning effective communication skills, parenting, conflict resolution, applying behavior plans, making positive changes, learning proper nutrition and working with community support specialists. The parents had exhibited no motivation to continue with any treatment or to provide a safe and stable home environment for the juvenile.

(Emphases added.)
As respondent mother correctly points out, the trial court's order did not address any of the plentiful evidence of her cognitive difficulties. I agree with respondent mother that clear, cogent, and convincing evidence does not support the findings that there was no reason that she could not pass the parenting test or that she had exhibited no motivation to continue with treatment or to provide a safe and stable home environment. This Court has previously explained that "one does not willfully fail to do something which it is not in his power to do. Evidence showing a parents' [sic] ability, or capacity to acquire the ability, to overcome factors which resulted in their children being placed in foster care must be apparent for willfulness to attach." In re Matherly, 149 N.C.App. 452, 455, 562 S.E.2d 15, 18 (2002) (quotations and citations omitted). Here, the evidence strongly suggests that respondent mother did not have the capacity to pass the parenting test or to fully comprehend and employ the parenting skills taught to her. The evidence shows that the guardian ad litem, social workers, and mental health professionals shared this concern. In addition, the evidence shows that respondent mother was highly motivated to become a good parent, but seemed to lack the practical skills and cognitive abilities to make good parenting decisions.
The majority leans on In re Oghenekevebe and In re Nolen to demonstrate that respondent mother's willfulness was established by her failure to send personal items to S.C.H. and her cessation of services required for unification. However, I do not find them persuasive. I do not agree with the majority's characterization of Oghenekevebe as "finding respondent willfully left child in foster care where she did not take advantage of DSS assistance with services such as counseling and parenting classes to improve her situation." It is clear from the opinion in Oghenekevebe that the respondent attended both parenting classes and therapy, but that her demonstration of parenting skills in the classroom was "inadequate" and that she did not "show any progress in her therapy until her parental rights were in jeopardy." In re Oghenekevebe, 123 N.C.App. 434, 437, 440, 473 S.E.2d 393, 397, 398 (1996). More importantly, the court in Oghenekevebe did not find that the respondent did not take advantage of DSS assistance, only that she "failed to positively respond to the diligent efforts of DSS to encourage the strengthening of her parental relationship with the child or to engage in constructive planning for the child" and failed to "show[ ] reasonable progress or a positive response toward the diligent efforts of DSS" Id. at 435, 440, 473 S.E.2d at 395, 398. The opinion does not specify whether those "efforts" included counseling or parental classes.
*481 In Nolen, on the other hand, is very specific about the respondent's actions with respect to her case plan and her children. The respondent in Nolen had a drinking problem and DSS ordered her to "enroll in and complete the STEP ONE program, to attend substance abuse counselling [sic], to attend AA meetings regularly and provide verification of her attendance, to attend parenting classes, and to abstain from the use of alcohol." In re Nolen, 117 N.C.App. 693, 698, 453 S.E.2d 220, 224 (1995). Over a three-and-a-half-year period, the respondent did not enroll in STEP ONE, attended counseling sporadically, did not regularly attend AA meetings, did not provide verification of her attendance at AA meetings, did not complete parenting classes, and did not abstain from using alcohol. Id. In fact, the respondent appeared at visitations with her children appearing intoxicated and smelling of alcohol. Id. One police officer testified that, during a two-year period, she had answered thirty to thirty-five disturbance calls at the respondent's residence and that, during each of those visits, the respondent appeared to be intoxicated. Id. The respondent countered that she had attended "several" AA meetings, had kept "irregular" contact with DSS, and had attended parenting classes and substance abuse treatment. Id. at 699, 453 S.E.2d at 224. The opinion does not elucidate whether the record supported these claims or if they were simply made in the brief. Regardless, respondent mother's situation is easily distinguished from that of the respondent in Nolen. Respondent mother here had participated in DSS services for years and had completed almost everything that was asked of her. At the time of the termination, respondent mother was supposed to be working with Mr. Berthiume and Learning Services, but had otherwise cooperated with the family services plan. Her failure to continue with Mr. Berthiume and Learning Services and her failure, as a semi-literate adult, to send cards to her child do not approach the massive failures exhibited by the respondent in Nolen. Although Nolen does stand for the proposition that "[a] finding of willfulness is not precluded even if the respondent has made some efforts to regain custody of the children," id. (citation omitted), I do not believe that the rule should be extended to allow a finding of willfulness if a respondent does not make every effort to regain custody.
Accordingly, I would hold that the challenged findings of fact are not supported by clear, cogent, and convincing evidence and that the trial court erred by finding that respondent mother had willfully left S.C.H. in foster care for more than twelve months because the evidence does not support a finding of willfulness.
However, a trial court needs only one ground upon which to terminate parental rights. Here, the trial court found three; subsections 7B-1111(a)(1) and (a)(3) are still in play. I address each in turn.

B. N.C. Gen.Stat. § 7B-1111(a)(3).
Section 7B-1111(a)(3) provides a ground for termination of parental rights if the trial court finds:
The juvenile has been placed in the custody of a county department of social services, a licensed child-placing agency, a child-caring institution, or a foster home, and the parent, for a continuous period of six months next preceding the filing of the petition or motion, has willfully failed for such period to pay a reasonable portion of the cost of care for the juvenile although physically and financially able to do so.
N.C. Gen.Stat. § 7B-1111(a)(3) (2007). The trial court's finding of fact 82 states that "the juvenile has been in the custody of the Department of Social Services for a continuous period of six (6) months and the parents have willfully failed to pay a reasonable portion of the cost of care for the child although physically and financially able to do so." This finding of fact is more properly categorized as a conclusion of law, and must therefore be supported by the order's findings of fact. See In re Helms, 127 N.C.App. 505, 510, 491 S.E.2d 672, 675 (1997) (explaining that "[a]ny determination requiring the exercise of judgment or the application of legal principles is more properly classified a conclusion of law") (citations omitted). A finding of fact that is essentially a conclusion of law will be treated as a fully reviewable conclusion of law on *482 appeal. In re M.R.D.C., 166 N.C.App. 693, 697, 603 S.E.2d 890, 893 (2004). Mislabeling of a finding of fact as a conclusion of law is inconsequential if the remaining findings of fact support the conclusion of law. In re R.A.H., 182 N.C.App. 52, 60, 641 S.E.2d 404, 409 (2007).
Finding of fact 32, which both respondents challenge, states:
The income of the parties and their expenses set froth [sic] through their testimony confirm their ability to pay funds for the support of the minora [sic] child in an amount in excess of zero. [Respondent father] pays for cigarettes and beer and these monies ($120.00 per month) could be provided for the monthly needs of the child. The monthly obligations of the parties total $600.00, leaving $37.00 from [respondent mother's] check that could be provided for the monthly needs of the child.
The court summarized respondents' monthly budget in finding of fact 21, which neither respondent challenged:
[Respondent parents] have the following monthly bills: $58.00 rent; $17.00 cable; $50.00 car insurance; $80-100 electricity; $20-30 gasoline; $70-80 phone bill; $80.00 food (supplemented by $168.00 in food stamps); $25.00 clothing; $30-40 hygiene; $120.00 for cigarettes. That these expenses total $600.00 per month.
Because finding of fact 21 was not challenged, it is binding on appeal, despite the questionable amounts listed for rent and gasoline. In re Humphrey, 156 N.C.App. 533, 540, 577 S.E.2d 421, 426 (2003).
"A finding that a parent has ability to pay support is essential to termination for nonsupport" pursuant to N.C. Gen.Stat. § 7B-1111(a)(3). In re Ballard, 311 N.C. 708, 716-17, 319 S.E.2d 227, 233 (1984).
In determining what constitutes a "reasonable portion" of the cost of care for a child, the parent's ability to pay is the controlling characteristic.
A parent is required to pay that portion of the cost of foster care for the child that is fair, just and equitable based upon the parent's ability or means to pay. What is within a parent's "ability" to pay or what is within the "means" of a parent to pay is a difficult standard which requires great flexibility in its application.
* * *
Nevertheless, nonpayment constitutes a failure to pay a reasonable portion if and only if respondent [is] able to pay some amount greater than zero.
In re Clark, 151 N.C.App. 286, 288-89, 565 S.E.2d 245, 247 (2002) (citations omitted). Our Supreme Court has held that a father had failed to pay a reasonable portion of his four children's cost of care when he paid a total of $90.00 for a forty-five week period, during which he earned approximately $5,625.00 and invested $60.00 per week into a hog operation despite a $30.00 court-ordered weekly child support obligation. In re Montgomery, 311 N.C. 101, 114, 316 S.E.2d 246, 254 (1984). However, in Montgomery, the trial court had ordered a weekly child support obligation, whereas in the present case, neither the trial court nor DSS ordered either respondent to pay child support. Nevertheless, "[t]he absence of a court order, notice, or knowledge of a requirement to pay support is not a defense to a parent's obligation to pay reasonable costs." See In re T.D.P., 164 N.C.App. 287, 289, 595 S.E.2d 735, 737 (2004). Still, the calculation of what constitutes reasonable costs remains. This Court does not typically make such calculations; instead we limit ourselves to approval or disapproval of the calculations made by lower courts. I find that the absence of the calculation in this case is, therefore, difficult from a procedural perspective.
The trial court found $37.00 that respondent mother could have sent to DSS, but I am troubled by the tight precision of the trial court's proposed budget. This appears to be a close case, and, given the seriousness of the consequences, I would err on the side of caution and hold that the evidence of respondents' income and expenses does not "confirm their ability to pay funds" in support of S.C.H. as found by the trial court in finding of fact 32. In support of this conclusion, one could look to our state's child support guidelines, which "include a self-support reserve *483 that ensures that obligors have sufficient income to maintain a minimum standard of living based on the 2006 federal poverty level for one person ($816.00 per month)." Respondent mother's income falls well below the limit of that self-support reserve.

C. N.C. Gen.Stat. § 7B-1111(a)(1).
N.C. Gen.Stat. § 7B-1111(a)(1) provides a ground for terminating parental rights if the parent has abused or neglected the juvenile within the meaning of N.C. Gen.Stat. § 7B-101. Section 7B-101(15), in relevant part, defines a "neglected juvenile" as
[a] juvenile who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare; or who has been placed for care or adoption in violation of law.
N.C. Gen.Stat. § 7B-101(15) (2007).
The trial court found the following findings of fact, which support a conclusion that S.C.H. was a neglected juvenile as defined in § 7B-101(15): Respondent mother refused to continue working with her literacy council tutor at the end of 2005, S.C.H. was twice left unsupervised in his crib with a bottle in a back bedroom with the door shut while respondent mother was sleeping, S.C.H. was found in his crib with dirty diapers and vomit on his person, S.C.H. was observed to have a diaper that was so full of fluid that it was leaking, respondent mother appeared to have been sleeping between 10:30 and 11:00 a.m., respondent mother answered the door slowly and with unclear speech, respondent mother tested positive for prescribed Valium, alcohol was found in respondent mother's residence that belonged to a roommate, respondent mother did not advise DSS or Mr. Berthiume before moving residences, and respondent mother did not obtain DSS's approval before moving residences.
Although these findings are not positive marks upon respondent mother's parenting record and certainly reflect irresponsibility, they are also not typical of the types of findings that result in an adjudication of neglect. See, e.g., In re J.A.P., 189 N.C.App. 683, 691, 659 S.E.2d 14, 19-20 (2008) (finding that the children were "very dirty," but also that "the mother required the children to eat roach-infested food and sleep in roach-infested beds" and "[g]oats were found to be living inside the home and a dead and decaying chicken was observed in the bathroom."); In re J.A.A. & S.A.A., 175 N.C.App. 66, 69, 623 S.E.2d 45, 47 (2005) (finding that the "children were dirty and unkempt and had not bathed recently," but also that the mother, rather than complying with any part of her court-ordered plan, "engaged in prostitution, drug use, and at one time, was admitted to Broughton Hospital for treatment for suicidal ideation"); In re E.C., 174 N.C.App. 517, 524, 621 S.E.2d 647, 653 (2005) (finding that the mother "kept the child in a filthy room with clothes and dirty diapers strewn about," but also that she "would leave the home for several days at a time" and could not complete drug rehabilitation because she fought the other residents); In re Castillo, 73 N.C.App. 539, 540, 327 S.E.2d 38, 39 (1985) (finding that the child was "dirty, nearly filthy, in wet diapers smelling of urine, improperly clothed in the wintertime . . . in her home which had no heat" and that she had "not been fed regularly or properly"). I would hold that those findings of fact that were unchallenged or otherwise supported by the evidence are insufficient to support a finding of neglect.
It appears that a contributing source of respondent mother's questionable parenting is her limited cognitive ability. The GAL and social worker both commented on it and noted that parents with respondent mother's limited abilities may be fit parents if they have enough support, which it appears that respondent mother does not. With such copious evidence of respondent mother's mental shortcomings, it is striking that DSS did not pursue termination pursuant to N.C. Gen.Stat. § 7B-1111(6), which states that the trial court may terminate parental rights if it determines:
That the parent is incapable of providing for the proper care and supervision of the juvenile, such that the juvenile is a dependent *484 juvenile within the meaning of G.S. 7B-101, and that there is a reasonable probability that such incapability will continue for the foreseeable future. Incapability under this subdivision may be the result of substance abuse, mental retardation, mental illness, organic brain syndrome, or any other cause or condition that renders the parent unable or unavailable to parent the juvenile and the parent lacks an appropriate alternative child care arrangement.
N.C. Gen.Stat. § 7B-1111(6) (2007) (emphases added).[2]

D. N.C. Gen.Stat. § 7B-1110.
Nevertheless, even if a valid ground for termination existed, I believe that the trial court erred by failing to consider S.C.H.'s relationship with her mother in its disposition order. N.C. Gen.Stat. § 7B-1110 states, in relevant part:
(a) After an adjudication that one or more grounds for terminating a parent's rights exist, the court shall determine whether terminating the parent's rights is in the juvenile's best interest. In making this determination, the court shall consider the following:
(1) The age of the juvenile.
(2) The likelihood of adoption of the juvenile.
(3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
(4) The bond between the juvenile and the parent.
(5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
(6) Any relevant consideration.
N.C. Gen.Stat. § 7B-1110(a) (2007) (emphases added). Here, the trial court made no findings as to the bond between S.C.H. and respondent mother.[3] Without a finding to this effect, I do not believe that we should assume that the court considered that factor. The majority explicitly acknowledges that the trial court made no specific finding addressing 7B-1110(a)(4), but brushes off the omission because "the trial court made multiple findings regarding the other enumerated factors." I am not convinced that a multitude of findings addressing some factors obviates the need to address the remaining factors when the statute mandates that the trial court address all of the factors. In addition, I do not believe that the bond between a parent and a child is sufficiently addressed by ticking off the number of gifts the parent has sent or the number of visits a parent has attended.
Accordingly, I would remand this matter to the trial court for consideration of the bond between S.C.H. and respondent mother and findings of fact to that effect.

Respondent Father's Appeal

A. N.C. Gen.Stat. § 7B-1111(a)(3).
Respondent father first argues that the trial court erred by concluding that he willfully failed to pay the cost of care for S.C.H. although physically and financially able to do so, thus providing a ground for terminating respondent-father's parental rights pursuant to N.C. Gen.Stat. § 7B-1111(a)(3) (2007). Respondent father argues that the findings *485 of fact do not support this conclusion because they show "an impoverished family struggling to survive."
The trial court found that respondent father had the following sources of income, which it reported as averages during 2008: $160.00 per month from Lee Steel ($1,920.00 annually); $350.00 per month for house cleaning during June, July, and August ($1,050.00 annually); $130.00 per month for hauling junk during August and September ($260.00 annually); and $80.00 per month for cutting grass during the summer months ($400.00). According to the trial court's findings, then, respondent father had an annual income of approximately $3,630.00.
As explained above, "[i]n determining what constitutes a `reasonable portion' of the cost of care for a child, the parent's ability to pay is the controlling characteristic." In re Clark, 151 N.C.App. 286, 288-89, 565 S.E.2d 245, 247 (2002). In its order, the trial court implicitly based finding of fact 32 on respondent mother's income, not respondent father's. Respondent father's annual income of $3,630.00 does not "confirm" his ability to pay an amount greater than zero for his child's support. I would hold that finding of fact 32 is not supported by clear, cogent, and convincing evidence with respect to respondent father. In turn, the trial court's conclusion of law that respondent father willfully failed to pay a reasonable amount towards the support of his minor son is also unsupported.

B. N.C. Gen.Stat. § 7B-1111(a)(1).
As recited above, a neglected juvenile is one who
does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian or caretaker; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare; or who has been placed for care or adoption in violation of law.
N.C. Gen.Stat. § 7B-1111(a)(1) (2007).
[E]vidence of neglect by a parent prior to losing custody of a childincluding an adjudication of such neglectis admissible in subsequent proceedings to terminate parental rights. The trial court must also consider any evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect. The determinative factors must be the best interests of the child and the fitness of the parent to care for the child at the time of the termination proceeding.

In re Ballard, 311 N.C. at 715, 319 S.E.2d at 232 (citations omitted).
As respondent father points out in his brief, "[t]his was not a home where purposeful activity by the parents resulted in neglect of this child[.]" Indeed, respondent father had substantially completed the following activities, which were required by his 2004 out of home family services agreement: substance abuse assessment, use of Home Again Services, complete a mental health evaluation, obtain and maintain employment, and complete a parenting class. He explained that he did not complete the mental health evaluation because he could not afford it; Medicaid covered respondent mother's, but he had no insurance to cover his.
Respondent father also accomplished nearly all of the activities required in his 2006 out of home service agreement: complete mental health evaluation, continue working with Mr. Berthiume, attend NA or AA meetings, attend parenting class at the Parenting Place from 27 April 2006 until 8 June 2006, and complete a diagnostic assessment by Learning Perspectives CBS Services.
Respondent father also now has a car and is employed. The adjudication order noted that he has a car and a GAL report described it as a Saturn. In its 9 December 2008 order denying respondent parents' petition for a guardian ad litem, the trial court found as fact that respondent father "is employed and has a side job cleaning beach houses. He works three to four days a week." Respondent parents had also moved into a suitable home nine months before the termination order was entered.
I would, therefore, hold that the findings of fact do not support the conclusion that respondent father has neglected S.C.H. and *486 that the findings of fact are not supported by clear, competent, and convincing evidence.

C. N.C. Gen.Stat. § 7B-1111(a)(2).
I next address respondent father's contention that the trial court improperly concluded that he had willfully left S.C.H. in foster care without making reasonable progress in correcting the conditions that led to his removal. See N.C. Gen.Stat. § 7B-1111(a)(2) (2007) (allowing a court to terminate parental rights upon a finding that "[t]he parent has willfully left the juvenile in foster care or placement outside the home for more than 12 months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of the juvenile. Provided, however, that no parental rights shall be terminated for the sole reason that the parents are unable to care for the juvenile on account of their poverty.").
As explained above, it appears from the record that respondent father made reasonable progress in correcting the conditions that led to S.C.H.'s removal. Although respondent father did not complete the cognitive assessment, it was known that he had difficulty writing and that respondent mother wrote for him, despite her own cognitive limitations. In addition, he completed the substance abuse assessment, completed the substance abuse treatment program, attended AA meetings, completed the home again services program, completed the parenting classes, moved into a clean and appropriate home, purchased a reliable car, and obtained a job. I would hold that the trial court's conclusion that termination pursuant to N.C. Gen.Stat. § 7B-1111(a)(2) was not supported by the findings of fact, and the findings of fact were not supported by clear, cogent, and convincing evidence.

D. N.C. Gen.Stat. § 7B-1110
Even assuming arguendo that grounds for termination of respondent father's parental rights exist, I believe that the trial court improperly concluded that it was in S.C.H.'s best interest for respondent father's parental rights to be terminated. As explained above, the trial court's order did not address the bond between respondent father and S.C.H. as required.

Conclusion
As imperfect as these parents may be, I do not believe that the evidence supports the grounds for termination upon which the trial court based its adjudication. Moreover, the findings in the disposition order are not sufficient to support termination of parental rights. Placement with respondent parents may, in fact, not be in the child's best interest, but the order must reach that conclusion based upon clear, cogent, and convincing evidence.
NOTES
[1] Respondent father received probation for driving with a revoked license.
[2] The trial court conducted a hearing to determine if respondent parents required their own guardian ad litem. The trial court concluded that, although respondent parents "may have some diminished capacity," they could "adequately act in their own behalf [sic] and in their own best interest." The trial court noted respondent mother's very low cognitive test results, but found as fact that respondent mother was "highly motivated toward performing well and has the cognitive and adaptive skills, which would permit her to successfully parent with sufficient family or natural support. Although it is unclear how she would be able to safely and successfully parent a child independently." (Emphases added.) As the order suggests, finding that a parent can participate in court proceedings is distinct from finding that the parent can provide proper care for her child.
[3] Melody Smith from Home Again included the following observation about the bond between respondent mother and S.C.H. in her 24 June 2005 summary and recommendation to the trial court: "Of primary importance is the presence of a strong maternal bond between her and [S.C.H.] She is very attuned to his needs and nurtures him extremely well. It is clear that the baby has bonded with his mother. [Respondent mother] is very patient and loving toward her son."